## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

Sophia Parker Studios, Inc.,                    Case No.  1:24cv2086

        Plaintiff,

    -vs-

                                         JUDGE PAMELA A. BARKER

Alice Temperley, et al., ,

        Defendants.                    MEMORANDUM OPINION & ORDER

Currently pending are Plaintiff Sophia Parker Studios, Inc.'s (1) Motion for a Temporary Restraining Order ("TRO") and an Order to Show Cause regarding a Preliminary Injunction (Doc. No. 3); and (2) Motion for Leave to File Memorandum of Law in Excess of Local Rule Page Limit Instanter (Doc. No. 4.)  Both Motions were filed on Saturday, November 30, 2024.

For the following reasons, Plaintiff's Motion for Leave to File Memorandum of Law in Excess of Local Rule Page Limit (Doc. No. 4) is granted.  Plaintiff's Motion for TRO and for Order to Show Cause (Doc. No. 3) is denied without prejudice.

## I.    Factual Allegations

The Complaint (Doc. No. 1) and Declaration of Sophia Parker (Doc. No. 3-6) contain the following factual allegations and averments, respectively.

### A.    The Copyrighted Artwork and Photographs

Sophia Parker is the Chief Executive Officer ("CEO") of Plaintiff Sophia Parker Studios, Inc. (hereinafter "Plaintiff").  (Doc. No. 1 at ¶ 2.)  Ms. Parker is "a visual artist who specializes in plant-based artworks, immersive botanical sculptures, and print designs."  (*Id*. at ¶ 2.)  Specifically, Ms. Parker "sculpt[s], shape[s], and hand paint[s] live and faux plants to create vibrant and eye-catching

sculptures that reimage traditional forms and propose new ways of thinking about what is natural." (Decl. of Sophia Parker (Doc. No. 3-6) at ¶ 2.)  Ms. Parker is "known in the art and fashion industries for [her] particular style of sculptural design, which combines geometrical botanical shapes with hand painted and vibrant geometric paint patterns." (*Id*. at ¶ 3.)

Ms. Parker avers that, "[t]o create the botanical sculptures, [she] heavily sculpt[s], shape[s], and physically alter[s] the form of live and faux plants to create wholly unique and original geometric forms."  (*Id*. at ¶ 6.)  For instance, "a particular medium that [Ms. Parker] incorporate[s] into many of [her] artworks is the reinterpretation of a particular type of palm plant known as the Dioon Edule Palm, which is physically straight in nature yet appears in heavily manipulated forms in [her] sculptures." (*Id*.) To achieve these heavily altered forms, Ms. Parker uses a series of techniques, including cutting the palms, warming the palm stems in a proprietary process to create the ability to appropriately bend and shape them, and incorporating physical restraints such as tethered strings to create a suspended in air appearance.  (*Id*.) Ms. Parker's "signature design aesthetic" that she includes in her sculptures involving the Dioon Edule Palm "features heavily altered palm fronds and curved stems, distinctive and vibrant color blocking painting techniques, geometric paint patterns, including the use of a reoccurring black and white checkerboard pattern, and the consistent incorporation of a cool medium blue paint tone on the palms stems."  (*Id*. at ¶ 8.)

In 2019, Plaintiff created a sculpture entitled "Memphis Chainsaw" (hereinafter "the Artwork").  (Doc. No. 1 at ¶ 36.)  Ms. Parker avers that she is the sole author of this original sculptural work and that she created it in her art studio in Flushing, New York.  (Doc. No. 3-6 at ¶ 10.)   The Dioon Edule Palm is the plant used in the Artwork.  (*Id*. at ¶ 6.)  The Artwork is a copyright-protected sculptural work that is registered with the U.S. Copyright Office (U.S. Copyright Office Registration

2

No.  VA  2-342-734),  and  is  pictured  below.  (Doc.  No.  1  at  ¶  40.)



After creating the Artwork, Ms. Parker took photos of it in her art studio and posted four of those photos on her Instagram account, @wifenyc, between September 2019 and April 2020 (collectively, "the Photographs").[1]  (Doc. No. 1 at ¶¶ 41, 42; Doc. No. 3-6 at ¶ 11.)  Plaintiff alleges that the Photographs are original works of authorship and that they are registered works of art with

---

[1] Ms. Parker's Instagram account has been a public account viewable to the general public since 2015, and currently has 98,800 followers.  (Doc. No. 3-6 at ¶ 12.)

3

the U.S. Copyright Office (U.S. Copyright Office Registration Nos. VA 2-352-960 and VA 2-420-961.)  (Doc. No. 1 at ¶ 1.)

### B.    Allegedly Infringing Temperley London Apparel Products

Defendants Alice Temperley, TMLL, Ltd. (t/a Temperley London),  and Temperley Holdings Ltd. (hereinafter referred to collectively as "the Temperley London Defendants") own a fashion brand named "Temperley London" that sells a wide range of luxury fashion items, such as embroidered dresses, kimonos, pantsuits, contemporary separates, and jackets.   (Doc. No. 1 at ¶ 5.)  Defendant Alice Temperley  (the Founder and Creative Director of Temperley London) is a citizen of the United Kingdom.   (*Id*. at ¶ 28.) Defendants TMLL, Ltd. and Temperley Holdings are private limited companies registered in England and/or Wales, with principal places of business in Ilminster, United Kingdom.  (*Id*. at ¶¶ 29, 30.)

In or around February or March 2022, the Temperley London Defendants began selling and distributing a Temperley London Spring Summer 2022 luxury fashion collection that included three (3) apparel items known as the "Farrah" products.  (*Id.* at ¶ 8.)  Plaintiff alleges that all three (3) of these "Farrah" apparel products[2] "include identical reproductions of Plaintiff's Artwork yet were created without Plaintiff's knowledge, consent, or any payment to her." (*Id*.) Plaintiff alleges "the Unauthorized Farrah Apparel Products are strikingly similar or at least substantially similar to Plaintiff's copyright-protected Artwork and the Photographs as they include almost exact replicas of

---

[2] The unauthorized Temperley London "Farrah" apparel products at issue in this lawsuit are: 1) the embroidered "Farrah Kimono" in three (3) colorways (i.e. black, pastel parchment, pale lilac); 2) the embroidered "Farrah Dress" in two (2) colorways (i.e. black and pastel parchment); 3) the embroidered "Farrah Strappy Dress" in two (2) colorways (i.e. black and pastel parchment); and 4) "any other subsequently discovered derivative apparel products" (collectively "Unauthorized Farrah Apparel Products").  (Doc. No. 1 at ¶ 9.)  *See also* Doc. No. 1-4.

Plaintiff's Artwork with only some minor color and pattern adjustments made to them."  (*Id.* at ¶ 10.) Plaintiff further alleges that the Temperley London Defendants copied Plaintiff's original Artwork by reproducing the Photographs found on Plaintiff's Instagram page to create digital renderings of the Artwork.  (*Id.* at ¶ 11.)  Defendants then allegedly used those renderings to create the derivative Farrah Apparel Products.  (*Id.*)  *See also* Doc. No. 3-6 at ¶ 14.

The Temperley London Defendants also produced, displayed, sold, and distributed another line of clothes in their Spring Summer 2022 collection known as the "Palmae" line.  (Doc. No. 1 at ¶ 12.)  According to Plaintiff, "[t]he prints on the Palmae products include unauthorized copies of certain copyright-protected elements of Plaintiff's Artwork, such as the blue stem of the palm plant, color-tipped fronds of the palm plant in the same color scheme as Plaintiff's Artwork, and the checkerboard black and white pattern on the palm fronds."[3]  (*Id.*)  Plaintiff alleges that the Unauthorized Palmae Apparel Products "are substantially similar to Plaintiff's copyright-protected Artwork and the Photographs" and "constitute unauthorized derivative works." (*Id.* at ¶ 14.)

After the launch of the Temperley London Spring Summer 2022 collection, the Temperley London Defendants promoted the collection to consumers in the United States via online and social media efforts and through fashion shows and in-person trunk shows at brick-and-mortar retailers.  (*Id.*

---

[3] The unauthorized Temperley London "Palmae" apparel products at issue in this lawsuit are: 1) the "Palmae Print Jacket" in one (1) colorway (i.e. black); 2) the "Palmae Print Dress" in two (2) colorways (i.e. black and parchment); 3) the "Palmae Print Trouser" in one (1) colorway (i.e. black); 4) the "Palmae Print Long Kaftan" in two (2) colorways (i.e. black and parchment); 5) the "Palmae Print Coat" in two (2) colorways (i.e. black and parchment); and 6) "any other subsequently discovered derivative apparel products" (collectively "Unauthorized Palmae Apparel Products").  (*Id.* at ¶ 13.)  *See also* Doc. No. 1-5.

at ¶ 46.)  The Temperley London Defendants also engaged in a U.S. tour to promote the new collection, including in Los Angeles, Houston, Palm Beach, and Naples, FL.[4] (*Id.* at ¶ 47.)

In February 2023, Plaintiff "discovered an advertisement in a window of a store in New York City that showed a model wearing a garment created by the Temperley London Defendants [i.e., the 'Farrah Kimono'] that included a reproduction of Plaintiff's Artwork on the front and sides of it. " (*Id.* at ¶ 7.)  Ms. Parker "instantly recognized her Artwork on the kimono." (*Id.*)  Plaintiff's discovery that day "led to the subsequent discovery of widespread infringement of her Artwork and the Photographs by Alice Temperley MBE [and] the Temperley London Defendants." (*Id.*)  *See also* Doc. No. 3-6 at ¶ 13.

### C.    Allegedly Infringing Temperley London/Romo Defendants Interior Products

Defendants Romo Ltd, Romo (Holdings) Ltd., and Romo, Inc. (hereinafter referred to collectively as "the Romo Defendants") own an interiors furnishing brand known as "ROMO" that produces fabrics, wallcoverings, trimmings, and accessories. (Doc. No. 1 at ¶ 15.) Defendants Romo Ltd. and Romo (Holdings) Ltd. are private limited companies registered in England with their principal places of business in the United Kingdom.  (*Id.* at ¶¶ 31, 32.)  Defendant Romo, Inc. is a United States corporation with its principal place of business in Chagrin Falls, Ohio.  (*Id.* at ¶¶ 16, 33.)  In addition, Romo, Inc. has showrooms in eight (8) U.S. cities, including New York, Boston, Atlanta, Chicago, Dallas, Washington DC, Miami, and Los Angeles.  (*Id.* at ¶ 16.)

---

[4] Plaintiff further alleges that Defendants displayed, sold, and distributed the Unauthorized Farrah Apparel Products and Unauthorized Palmae Apparel Products to United States consumers through Temperley London's website, ROMO's website, Temperley London's Instagram accounts, Alice Temperley MBE's Instagram account, ROMO's Instagram account, Temperley London's Facebook account, ROMO's Facebook account, and Temperley London's Twitter/X account.  (*Id.* at ¶ 62.)

In March 2023, the Temperley London Defendants and the Romo Defendants launched a joint collaboration known as the Temperley London x ROMO "A World Less Ordinary" interiors collection, which consists of fabrics, cushions, trims, and wallpaper products. (*Id*. at ¶ 17.) Plaintiff alleges that, through this collection, "Defendants again made unauthorized use of Plaintiff's Artwork and the Photographs and sold products that violated Plaintiff's copyright rights – this time in the form of fabrics and cushions." (*Id*.)

Defendants displayed the Unauthorized Farrah Interiors Products at the London Institute of Contemporary Arts for the Temperley London x ROMO "A World Less Ordinary" collection launch party in March 2023. (*Id*. at ¶ 66.) That same month, Defendants also displayed the Unauthorized Farrah Interiors Products in the Romo showroom at London Design Week, where it drew a significant audience. (*Id*. at ¶ 67.) Moreover, after the launch of the collection in England, Defendant Alice Temperley and Romo's Director of Design & Excellence for Romo, Emily Mould, went on a North American tour promoting the Temperley London x ROMO "A World Less Ordinary" product line across the United States.[5] (*Id*. at ¶ 68.) *See also* Doc. No. 3-6 at ¶ 15.

In March 2023 (i.e., the same month Defendants' interior products line was released), Plaintiff discovered that Defendants had created four (4) products as part of the collection that included almost exact replicas of the Artwork and the Photographs.[6] (Doc. No. 1 at ¶ 18.) *See also id*. at ¶¶ 64-65.

---

[5] Plaintiff further alleges that Defendants displayed, sold, and distributed the Unauthorized Farrah Interiors Products to United States consumers through ROMO's showrooms located throughout the United States and the world, through ROMO's website, Temperley London's website, Temperley London's Instagram account, ROMO's Instagram account, Alice Temperley MBE's Instagram account, Temperley London's Facebook account, ROMO's Facebook account, Temperley London's Twitter/X account, and ROMO's Pinterest account. (*Id*. at ¶ 77.)

[6] The unauthorized Temperley London x ROMO "Farrah" interiors products at issue in this lawsuit are: 1) the embroidered "Farrah Agave" fabric; 2) the embroidered "Farrah Lilac Ash" fabric; 3) the embroidered "Farrah Agave" cushion; and 4) the embroidered "Farrah Lilac Ash" cushion (collectively "Unauthorized Farrah Interiors Products"). (*Id*. at ¶ 19.) *See also* Doc. No. 1-6.

Plaintiff never gave permission or consent to Defendants to reproduce, display, distribute, or sell derivative works that featured the Artwork or the Photographs, and never received any payment from Defendants relating to their reproduction, display, distribution, or sale of the Unauthorized Farrah Interiors Products.  (*Id.* at ¶ 70.)

### D. Defendants' Allegedly Infringing Advertising Works

In addition to the sale of the aforementioned infringing apparel and interiors products set forth above, Plaintiff alleges that Defendants have and continue to reproduce, display, and distribute photographs, videos, and other advertisements that include unauthorized reproductions of the Artwork and the Photographs via their social media accounts, websites, brick-and-mortar stores, showrooms, newsletters, email blasts, and elsewhere.  (*Id*. at ¶¶ 81-82, 89-91, 101-103.)

### E. April 2024 Cease and Desist Letter

On April 9, 2024, Plaintiff, through its counsel, sent a Cease and Desist Letter to the Temperley London Defendants and the Romo Defendants demanding that they "immediately cease and forever desist any further reproduction, display, distribution, creation of derivative works, and sale of the infringing products listed above [i.e. Unauthorized Farrah Apparel Products, Unauthorized Palmae Apparel Products, Unauthorized Farrah Interiors Products]." (Doc. No. 3-6 at ¶ 16; Doc. No. 3-4 at PageID# 405.)  Plaintiff further demanded that Defendants remove and/or delete "all forms of infringing advertisements, product listings, social media posts/stories, etc. displaying the above-mentioned infringing products."  (*Id*.)

Plaintiff alleges that, despite receiving this Cease-and-Desist Letter, Defendants are still selling, distributing, and displaying the Unauthorized Farrah Interiors Products.  (Doc. No. 1 at ¶ 80.) Moreover, Defendants are allegedly still displaying the Unauthorized Advertising Works  featuring

reproductions of the Unauthorized Farrah Apparel Products, Unauthorized Palmae Apparel Products, and Unauthorized Farrah Interiors Products.  (*Id*. at ¶¶ 80, 85, 97, 106.)  *See also* Doc. No. 3-6 at ¶ 17.

      **F.**    **December 2024 Untitled Art Fair**

Ms. Parker alleges that, from December 4-8, 2024, she is scheduled to display a "14-piece sculptural artwork collection at the Untitled Art Fair in Miami Beach, Florida, which runs alongside the world-renowned Art Basel Miami Beach." (Doc. No. 3-6 at ¶ 18; Doc. No. 1 at ¶ 2.)  Ms. Parker avers that the sculptures she intends to show at the Untitled Air Fair "include pieces that represent [her] signature style of botanical design" (Doc. No. 3-6 at ¶ 18.)  Specifically, "several of the artworks that [she] intend[s] to exhibit will consist of Dioon Edule Palms that are shaped and heavily altered in [her] original copyright-protected geometrical forms that are then hand painted by [her] in intricate and copyright-protected paint designs." (*Id*.)

Plaintiff attaches a photograph of one of the fourteen artworks that Ms. Parker intends to show at the Untitled Art Fair, as an Exhibit to the Motion for TRO.  (Doc. No. 3-5.) Plaintiff does not, however, provide photographs of any of the other artworks that she intends to display at the Untitled Art Fair.  Notably, Plaintiff does not allege that she intends to show the specific Artwork and/or Photographs that are the subject of this lawsuit, at the upcoming Untitled Art Fair.

**II.**    **Procedural History**

On November 30, 2024, (over seven and a half months after sending its Cease and Desist Letter), Plaintiff filed a Complaint in this Court against the Temperley London Defendants, Romo Defendants, and Doe Defendants 1-20, asserting the following four claims: (1) direct copyright infringement under 17 U.S.C. § 501; (2) vicarious and contributory copyright infringement; (3)

9

distribution of false copyright management information in violation of 17 U.S.C. § 1202; and (4) accounting. (Doc. No. 1.)

On that same date, Plaintiff filed a Motion for Temporary Restraining Order and an Order to Show Cause Regarding a Preliminary Injunction. (Doc. No. 3.) Plaintiff's Motion is twenty-eight pages in length (well over the fifteen page limit set forth in Local Rule 7.1(f)) and supported by over three hundred pages of Exhibits. (Doc. Nos. 3-2 through 3-22.) Due to its length, Plaintiff also filed a Motion for Leave to File Memorandum of Law in Excess of the Local Rule Page Limit, Instanter. (Doc. No. 4.) In the exercise of its discretion, the Court hereby grants Plaintiff's Motion for Leave and will consider Plaintiff's lengthy Motion for TRO and Exhibits as filed.

In its Motion for TRO, Plaintiff argues that a TRO "enjoining Defendants from continuing to blatantly and willfully infringe upon Plaintiff's exclusive copyright rights in the Artwork and the Photographs is necessary because Plaintiff will be irreparably harmed if Defendants' unlawful actions are not immediately enjoined." (Doc. No. 3-2 at PageID# 371.) In support of its assertion of irreparable harm, Plaintiff emphasizes as follows:

> Importantly, from December 4-8, 2024, Plaintiff is scheduled to display a 14-piece sculptural artwork collection at the Untitled Art Fair in Miami Beach, Florida, which runs alongside the world-renowned Art Basel Miami Beach "where leading galleries from five continents" will display "significant works by the masters of Modern and contemporary art, as well as the new generation of emerging stars." The sculptures to be shown by Plaintiff at the Untitled Art Fair, a fair dedicated to emerging talent and contemporary artists, will represent her distinct style of botanical design. Specifically, several of the artworks to be shown by Plaintiff at the Untitled Art Fair will consist of Dioon Edule Palms that are shaped and heavily altered by Plaintiff in her original copyright-protected geometrical forms that are then hand painted by Plaintiff in intricate and copyright-protected paint designs. One of the artworks to be shown by Plaintiff at the Untitled Art Fair is set forth in Exhibit C. Upon review of this work and the Artwork that was infringed upon by Defendants, it is apparent that Plaintiff's unique expression of artistry is present in both works. Critically, several of the copyright-protected elements of the Artwork at issue in this lawsuit, including the original hook-shaped curved forms of the plant, the black and white checkerboard

10

patterned palm fronds, the signature and distinctive blue stems in a cool medium blue paint tone, and the particular intricate geometric paint patterns and color schemes created by Plaintiff, will also be reproduced in the sculptural works that Plaintiff intends to show at the Untitled Art Fair.

It is essential to Plaintiff's business and reputation in the art and fashion industries that the Artwork and the new artworks to be shown by Plaintiff at the Untitled Art Fair are identified by the international media, art galleries, designers, fellow artists, and potential buyers as unmistakably original to Plaintiff and no one else. If Defendants are not immediately enjoined from their infringing conduct, Plaintiff will be irreparably harmed as there is a high likelihood that the public will confuse her original artworks with the derivative and infringing products produced by Defendants, which will damage Plaintiff's reputation and marketability in the art and fashion industries. If Defendants continue to degrade the value of the Artwork and confuse the public as to who the original creator of the Artwork and Plaintiff's distinctive style of artistic design is by creating, selling, and displaying infringing products, Plaintiff will be irreparably harmed.
.

(*Id.* at PageID#s 371-372) (internal citations and footnotes omitted).

Plaintiff asks the Court to issue a broad and expansive Restraining Order that:

(1) enjoins Defendants from continuing to reproduce, sell, distribute, display, or create derivative works of the Artwork and the Photographs or otherwise infringe upon Plaintiff's exclusive copyright rights in the Artwork and the Photographs;

(2) orders Defendants to take down and remove all website listings, links, offers for sale, social media posts/stories, photographs, videos, advertisements, in-store or showroom displays, including brochures, fabric swatch books, or other displays, print listings and publications of the Unauthorized Farrah Apparel Products, Unauthorized Palmae Apparel Products, and Unauthorized Farrah Interiors Products, within 24 hours from the issuance of the Order;

(3) orders Defendants to cease selling, offering for sale, taking orders, and fulfilling orders for the Unauthorized Farrah Interiors Products, Unauthorized Farrah Apparel Products, or Unauthorized Palmae Apparel Products or any other derivative products that infringe upon Plaintiff's copyright rights in the Artwork and the Photographs, within 24 hours from the issuance of the Order;

(4) orders Defendants to cease all further production regarding the Unauthorized Farrah Interiors Products, Unauthorized Farrah Apparel Products, Unauthorized Palmae Apparel Products or any other derivative products that infringe upon Plaintiff's copyright rights in the Artwork and the Photographs, within 24 hours from the issuance of the Order;

11

(5) orders that the Unauthorized Farrah Interiors Products, all molds or other articles by which such copies may be reproduced, all records documenting the manufacture, sale, or receipt of things involved in the production of Unauthorized Farrah Interiors Products, and any fabric swatch books, brochures, or other sales or advertising documents relating to the Unauthorized Farrah Interiors Products that are in the possession, custody, or control of the ROMO Defendants and their officers, agents, employees, attorneys, and any and all other persons acting in active concert with them be impounded and no later than 48 hours from the issuance of the Order are to be placed in storage unit(s) that can only be accessed by a senior management member of ROMO and cannot be accessed by general employees at the ROMO headquarters in Chagrin Falls, Ohio or at the various ROMO showrooms;

(6) orders that the Unauthorized Farrah Apparel Products, Unauthorized Palmae Apparel Products, and Unauthorized Farrah Interiors Products, all molds or other articles by which such copies may be reproduced, all records documenting the manufacture, sale, or receipt of things involved in the production of the Unauthorized Farrah Apparel Products, Unauthorized Palmae Apparel Products, and Unauthorized Farrah Interiors Products, and any fabric swatch books, brochures, or other sales or advertising documents relating to the Unauthorized Farrah Apparel Products, Unauthorized Palmae Apparel Products, and Unauthorized Farrah Interiors Products that are in the possession, custody, or control of Alice Temperley MBE, the Temperley London Defendants, and their officers, agents, employees, attorneys, and any and all other persons acting in active concert with them be impounded and no later than 48 hours from the issuance of the Order are to be placed in storage unit(s) that can only be accessed by a senior management member of Temperley London and cannot be accessed by general employees at Temperley London;

(7) orders that Defendants shall provide to counsel of record for Plaintiff a list (with contact information) of any and all individuals or entities who have in the past sold or distributed or are currently selling or distributing the Unauthorized Farrah Interiors Products, Unauthorized Farrah Apparel Products, and/or Unauthorized Palmae Apparel Products, within 48 hours of the issuance of the Order;

(8) orders that Defendants shall provide to counsel of record for Plaintiff, within 48 hours of issuance of the Order, an affidavit verifying that all of the actions listed herein have been taken by Defendants; and

(9) orders that Defendants shall preserve all of the actual physical apparel and interiors products at issue in this case (i.e. Unauthorized Farrah Apparel Products, Unauthorized Palmae Apparel Products, Unauthorized Farrah Interiors Products), any website listings (deactivate them yet preserve evidence of listings), social media posts/stories (deactivate/archive them yet preserve evidence of posts/stories), advertisements, fabric swatch books, brochures, hard drive information, digital

information and communications, design references, equipment used to access, modify, edit, and create the Unauthorized Farrah Apparel Products, Unauthorized Palmae Apparel Products, Unauthorized Farrah Interiors Products, as well as any other materials, documents, or evidence that may be potentially relevant to Plaintiff's claims.

(*Id*. at PageID#s 25-27; Doc. No. 3-1.)

Plaintiff asks the Court to issue the above TRO without Notice to Defendants (or an opportunity for Defendants to respond) because "Defendants were previously provided notice of the infringements at issue in this lawsuit  pursuant to a detailed Cease-and-Desist Demand Letter that was sent to them in April 2024 and was subsequently accepted and acknowledged by their respective counsel and company representatives." (Certification of Attorney Alyssa M. Bruno, Esq. (Doc. No. 3-22) at ¶ 1.)  Plaintiff further requests that Court waive the requirement for bond to be posted "due to the hardship that would be caused to Plaintiff should a bond be required,"  Plaintiff's "substantial likelihood of success on the merits," and the "immediate irreparable harm that will result to Plaintiff if Defendants are not immediately enjoined from their continued infringing activities."  (Doc. No. 3-2 at PageID# 389.)

As noted above, Plaintiff filed its Complaint and Motion for TRO on Saturday, November 30, 2024.  The case was assigned to the undersigned on Monday, December 2, 2024.  Notably, at no point in its Motion does Plaintiff explain why it waited until two business days before the commencement of the December 4-8, 2024 Untitled Art Fair to seek emergency injunctive relief -- despite the fact that Ms. Parker has been aware of the allegedly infringing conduct since *February 2023* and, in fact, sent a Cease and Desist Letter over seven months ago in April 2024.

**III.    Legal Standard**

13

Federal Rule of Civil Procedure 65 addresses injunctions and temporary restraining orders and "provides the procedure that the district court must follow when granting injunctive relief." *First Tech. Safety Sys. Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993).  Here, Plaintiff seeks the issuance of a TRO without notice to Defendants pursuant to Rule 65(b)(1).  (Doc. No. 3-2 at PageID# 389.)  Rule 65(b)(1) provides, in relevant part, as follows:

> **(b) Temporary Restraining Order**.
>
> **(1) Issuing Without Notice**. The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1).  The Advisory Committee Notes to Rule 65 further explain that "[i]n view of the possibly drastic consequences of a temporary restraining order, the opposition should be heard, if feasible, before the order is granted." Fed. R. Civ. P. 65, Advisory Committee's note (1966 Amendment).   As the Sixth Circuit has explained, "[t]he Rule 65(b) restrictions on the availability of *ex parte* temporary restraining orders reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *First Tech. Safety Sys.*, 11 F.3d at 650 (internal quotation marks omitted).

In sum, "[a] Temporary Restraining Order ('TRO') is an emergency measure." *Hartman v. Acton*, 613 F.Supp.3d 1015, 1021 (S.D. Ohio April 21, 2020) (citing *McGirr v. Rehme*, 2017 WL 1426456 at * 1 (S.D. Ohio Apr. 21, 2017)).  It is meant "to prevent immediate and irreparable harm

14

to the complaining party during the period necessary to conduct a hearing on a preliminary injunction." *Dow Chemical Co. v. Blum*, 469 F. Supp. 892, 901 (E.D. Mich. 1979). *See also Hartman*, 613 F.Supp.3d at 1021. As several district courts have noted, a TRO "should only be granted if the movant can clearly show the need for one." *Kendall Holdings, Ltd v. Eden Cryogenics, LLC*, 630 F.Supp.2d 853, 860 (S.D. Ohio 2008). *See also Slave Legacy LLC v. Son of Slave*, 2023 WL 3919317 at * 3 (S.D. Ohio June 9, 2023).

The Court considers the following four factors in determining whether to impose a TRO: (1) whether plaintiff has a substantial likelihood or probability of success on the merits; (2) whether plaintiff will suffer irreparable injury if the relief is not granted; (3) whether the injunctive relief would unjustifiably harm a third party; and (4) whether the public interest would be served by issuing the injunctive relief. *See Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *Am. Family Life Ins. Co. v. Hagan*, 266 F. Supp.2d 682, 687 (N.D. Ohio 2002). The test is a flexible one and the factors are not prerequisites to be met but considerations that must be balanced against each other. *See Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (citing cases); *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

The plaintiff bears the burden of establishing entitlement to the extraordinary remedy of a temporary restraining order. *See Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (citations omitted). While no single factor is determinative, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). In addition, in the context of a temporary restraining order, there is emphasis on consideration of irreparable harm in order to preserve the status quo. *See Just Funky, LLC v. Boom Trendz, LLC*, 2021 WL 2635377 at * 2 (N.D. Ohio June 25, 2021); *Reid v. Hood*, 2011 WL 251437

15

at *2 (N.D. Ohio Jan. 26, 2011); *Procter & Gamble Co. v. Bankers Trust Co*., 78 F.3d 219, 226 (6th Cir. 1996) ("[T]he purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had.").

## IV.    Analysis

The Court has carefully reviewed Plaintiff's lengthy Complaint and Motion for TRO.  For the following reasons, the Court finds that Plaintiff has failed to satisfy the procedural requirements for issuance of a TRO without notice to Defendants as set forth in Fed. R. Civ. P. 65(b)(1).  Accordingly, and as explained in further detail below, Plaintiff's Motion for TRO is denied without prejudice.

### A.    Rule 65(b)(1)(B)

The Court first finds that Plaintiff has not satisfied the requirements set forth in Rule 65(b)(1)(B).  As noted *supra*, that Rule states that a court may issue a TRO without notice to the adverse party or its attorney only if (among other things) the movant's attorney "certifies in writing any efforts made to give notice [to the adverse party or its attorney] and the reasons why it should not be required."  Fed. R. Civ. P. 65(b)(1)(B).  The Sixth Circuit has emphasized that "our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *First Tech. Safety Sys*., 11 F.3d at 650.  *See also Slave Legacy, LLC*, 2023 WL 3919317 at * 2; *Davis v. Colerain Twp*., 2024 WL 488211 at * 1 (S.D. Ohio Feb. 8, 2024); *Oviedo v. Rivera*, 2023 WL 2431819 at * 4 (S.D. Ohio March 9, 2023).  For this reason, district courts in this Circuit have found that the requirements set forth in Rule 65(b)(1) must be "scrupulously honored." *Alahverdian v. Nemelka*, 2015 WL 1276453 at *2 (S.D. Ohio Mar. 19, 2015) (quoting Moore's Federal Practice § 2952).  *See also Clinton Solart LLC v. Stoll,* 2023 WL 3024357 at * 1 (S.D. Ohio April 20, 2023).  Motions for TRO without notice are

16

routinely denied without prejudice for failure to comply with the certification requirement in Rule 65(b)(1). *See, e.g., Slave Legacy, LLC*, 2023 WL 3919317 at * 2; *Davis*, 2024 WL 488211 at * 1; *Clinton Solart LLC*, 2023 WL 3024357 at * 1; *Moore v. U.S. Center for SafeSport*, 685 F.Supp.3d 490, 495 (E.D. Mich. 2023).

Here, Plaintiff's counsel, Attorney Alyssa M. Bruno, provides a "Certification" as an Exhibit to the Motion for TRO. (Doc. No. 3-22.) However, therein, Attorney Bruno states only that notice is not necessary because "Defendants were previously provided notice of the infringement at issue in this lawsuit pursuant to a detailed Cease and Desist Letter that was sent to them in April 2024 and was subsequently accepted and acknowledged by their respective counsel and company representatives." (*Id.* at ¶ 1.) Attorney Bruno goes on to aver that "[n]otice of Plaintiffs Motion for a [TRO] should not be required in this case due to Defendants' continued willful infringement and the immediate irreparable harm that will result to Plaintiff if Defendants' unlawful conduct is not immediately enjoined as set forth in the Motion for [TRO] and accompanying Memorandum of Law in Support of the Motion for [TRO]." (*Id.* at ¶ 5.)

The Court finds that Attorney Bruno's Certification fails to satisfy Rule 65(b)(1)(B). While Plaintiff did send a Cease and Desist Letter to Defendants, this Letter was sent to Defendants nearly eight months ago (on April 9, 2024) and does not notify Defendants of the filing (or imminent filing) of the instant Motion for TRO in this Court. (Doc. No. 3-4.) At most, the April 9, 2024 Letter suggests the possibility that, "if a prompt settlement is not reached," Plaintiff is "prepared to initiate litigation in federal court for copyright infringement and display of false copyright management information." (*Id.* at PageID# 405.) At no point in this Letter does Plaintiff notify Defendants that it has filed, or intends to file, a motion for emergency injunctive relief. (*Id.*) To the contrary, the

17

Letter advises Defendants only that Plaintiff is "seeking compensatory relief in the form of actual damages and disgorgement of … profits." (*Id*.)  The words "temporary restraining order" and/or "emergency injunctive relief" do not appear anywhere in the April 9, 2024 Letter.  (*Id*.)  Nor does Attorney Bruno indicate in her Certification that she has otherwise undertaken any efforts, whatsoever, to notify Defendants and/or Defendants' counsel of the filing of the instant Motion.[7]  The Court finds this to be insufficient under Rule 65(b)(1)(B).  *See, e.g., Bleavins v. O'Neal*, 2022 WL 885176 at *3 (W.D. Tenn. Mar. 24, 2022) (movant failed to comply with Rule 65(b)(1)(B) where, although it asserted that notice should not be required because the adverse party knew about the underlying proceedings, movant's counsel "described no attempts at all to provide notice to [adverse party]" of the *motion for a TRO*) (emphasis added).

The Court further finds that Attorney Bruno has failed to sufficiently articulate reasons why notice should not be required.  "The normal circumstance for which the district court would be justified in proceeding *ex parte* is where notice to the adverse party is impossible, as in the cases where the adverse party is unknown or is unable to be found[,] ... [or] where notice to the defendant would render fruitless further prosecution of the action." *First Tech. Safety Sys., Inc*., 11 F.3d at 650. *See also Davis*, 2024 WL 488211 at * 2.   In the instant case, Plaintiff's counsel failed to certify how this case would fall into either of these circumstances.  Moreover, Plaintiff and her counsel are clearly aware of the identities and addresses of each of the Defendants, as they have previously communicated with Defendants through Attorney Bruno's April 9, 2024 Letter.  In addition, Plaintiff has repeatedly stated (and Attorney Bruno has certified) that the April 9, 2024 Letter was "accepted

---

[7] The Court notes that neither the Complaint nor the Motion for TRO include a Certificate of Service.

and acknowledged by [Defendants'] respective counsel and company representatives."[8] (Doc. No. 3-22 at ¶ 1.)  Plaintiff has also failed to certify that notice to Defendants would render fruitless further prosecution of the action.  Thus, the Court concludes that Plaintiff has failed to satisfy the requirements of Rule 65(b)(1)(B) and *ex parte* relief is therefore inappropriate.  *See, e.g., Clinton Solart LLC*, 2023 WL 3024357 at *2 (denying temporary restraining order in light of failure to comply with Rule 65(b)(1)(B)); *Slave Legacy, LLC*, 2023 WL 3919317 at *5 (holding that courts may not issue temporary restraining orders if Rule 65(b)(1)(B) has not been satisfied) (collecting cases).

## B.    Rule 65(b)(1)(A)

The Court next finds that Plaintiff has failed to satisfy Rule 65(b)(1)(A).  As noted above, that Rule provides that a court may issue a TRO without notice to the adverse party or its attorney only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant *before the adverse party can be heard in opposition*."  Fed. R. Civ. P. 65(b)(1)(A) (emphasis added).  As explained below, the Court finds that Plaintiff herein has failed to set forth "specific facts" that "clearly show" that it will suffer immediate and irreparable harm if the requested TRO is not issued before the Defendants can be heard in opposition.

At the outset, the Court notes that Plaintiff has not filed a Verified Complaint in this action.  Thus, the Court limits its analysis to the averments in Ms. Parker's Declaration, which is attached to

---

[8] The Court notes that Plaintiff has not directed this Court's attention to any documentation demonstrating Defendants' receipt, "acknowledgement," and/or response(s) to the April 9, 2024 Letter.  While Plaintiff variously cites to Exhibits M, N, and P-R in support of the assertion that Defendants "received and acknowledged" the Cease and Desist Letter, none of those Exhibits, in fact, reflect Defendants' receipt of this specific Letter.  (Doc. No. 3-2 at PageID#s 378, 379.)  Nor does Plaintiff cite to any sort of correspondence from Defendants (or their counsel) "acknowledging" the April 9, 2024 Cease and Desist Letter.

the Motion for TRO as Exhibit D.   (Doc. No. 3-6.)   Therein, Ms. Parker generally avers that Defendants have infringed and are continuing to infringe on the Artwork and Photographs.   However, in her Declaration, Ms. Parker herself acknowledges that she became aware of Defendants' alleged infringement in February 2023—over twenty (20) months ago.   (*Id.* at ¶ 13.)   Ms. Parker further avers that, despite discovering the alleged infringement in February 2023, she did not send a Cease and Desist Letter to Defendants, through counsel, until over a year later, in April 2024.   (*Id.* at ¶ 16.) Plaintiff then waited another seven months and twenty one days (i.e., until Saturday, November 30, 2024) to file her Motion for TRO.   (Doc. No. 3.)   Plaintiff offers no explanation for this delay, in either Ms. Parker's Declaration or the Motion for TRO.

The only "specific facts" in Ms. Parker's Declaration that appear to be intended to show "immediate and irreparable injury" relate to the Untitled Art Fair, which is scheduled to commence tomorrow, on December 4, 2024.   Specifically, in her Declaration, Ms.  Parker avers as follows:

18)   Next week, from December 4-8, 2024, I am scheduled to display a 14-piece sculptural artwork collection at the Untitled Art Fair in Miami Beach, Florida, which runs alongside the world-renowned Art Basel Miami Beach. The sculptures I intend to show at the Untitled Air Fair include pieces that represent my signature style of botanical design. Specifically, several of the artworks that I intend to exhibit will consist of Dioon Edule Palms that are shaped and heavily altered in my original copyright-protected geometrical forms that are then hand painted by me in intricate and copyright-protected paint designs. One of the artworks I intend to show at the Untitled Art Fair is set forth in Exhibit C.

19)   Certain copyright-protected elements of the Artwork at issue in this lawsuit, including the hook-shaped curved forms of the plant, the black and white checkerboard, patterned palm fronds, signature and distinctive blue stems in a cool medium blue paint tone, and the intricate geometric paint patterns and color schemes, will also be reproduced in sculptural works I intend to show at the Untitled Art Fair.

20)   It is essential to my business and reputation in the art world that the Artwork and the new works to be shown at the Untitled Art Fair are identified by the international media, art galleries, designers, fellow artists, and potential buyers as unmistakably original to me and no one else.

20

21)  If Defendants are not immediately enjoined from their infringing conduct, I will be irreparably harmed as there is a high likelihood that the public will confuse my original works with the derivative and infringing products produced by Defendants, which will damage my reputation and marketability in the art and fashion industries.

22)  If Defendants continue to degrade the value of the Artwork and confuse the public as to who the original creator of the Artwork and my distinctive style of artistic design is by creating, selling, and displaying infringing products, I will be irreparably harmed.

23)  I am particularly concerned that the ROMO Defendants have one of their main showrooms located in Dania Beach, FL, which is only 35 minutes from the Untitled Art Fair in Miami, FL where I will be displaying my artworks. I will be irreparably harmed if the public associates or confuses my Artwork with the infringing apparel and interiors products produced by Defendants.

(*Id*. at ¶¶ 18-23.)

The Court finds the above allegations are insufficient to "clearly show" that Plaintiff will suffer immediate and irreparable injury, loss, or damage if a TRO is not issued before Defendants can be heard in opposition.  First, Plaintiff has not explained why it waited until two (2) business days before the opening of the Untitled Art Fair to seek emergency injunctive relief.  As noted above, despite being aware of the alleged infringement since February 2023, Plaintiff did not send a Cease and Desist Letter to Defendants until April 9, 2024 and then waited another seven months and twenty one days to file the instant action and Motion for TRO.  Plaintiff does not provide any specific facts regarding when Ms. Parker became aware of the Untitled Art Fair and/or when she decided to participate in it.  There is no representation in any of Plaintiff's filings, that Ms. Parker was somehow prevented from timely moving for a TRO because she only recently became aware of and decided to participate in the Untitled Art Fair.  Instead, it appears from the record currently before this Court that Ms. Parker affirmatively chose to wait until the eve of the Untitled Art Fair to seek a TRO without notice to Defendants.

21

The Court finds Plaintiff's unexplained delay in seeking emergency injunctive relief has played at least a significant part in the now urgent nature of the requested relief.  Given the circumstances, the Court finds Plaintiff's unexplained delay cuts strongly against her claim that she will suffer "immediate and irreparable injury" if this Court does not issue her extremely broad and expansive proposed TRO before Defendants are provided the opportunity to respond. *See, e.g. Burton v. Kettering Adventist Health Care,* 2020 WL 3265526 at *3 (S.D. Ohio June 17, 2020) ("delay in seeking a TRO or preliminary injunction does not preclude any possibility of relief or absolutely preclude a showing of irreparable harm," but "is still a factor to be considered," and "in addition to being considered in balancing the hardships, delay in pursuing relief undercuts claims of irreparable harm and may be considered as circumstantial evidence that the potential harm to plaintiff is not irreparable or as great as claimed.")

Even aside from Plaintiff's unexplained delay, the Court finds that Ms. Parker's averments regarding the Untitled Art Fair are insufficient to "clearly show" that immediate and irreparable injury will result if a TRO is not granted before Defendants can be heard in opposition.  In her Declaration, Ms. Parker does not state that she intends to show the Artwork and/or Photographs that are the subject of this lawsuit at the Untitled Art Fair.  (Doc. No. 3-6.)  Rather, Ms. Parker avers that the fourteen pieces she intends to show "represent her signature style of botanical design" and include "copyright protected elements" that she believes are common to the Artwork at issue herein.  (*Id*. at ¶¶ 18, 19.) The Court finds these averments to be insufficient.  Although Ms. Parker avers, summarily, that all fourteen pieces are similar in some fashion to the Artwork at issue herein, Plaintiff only provides this Court with a photograph of one of the fourteen pieces.  (*Id*. at ¶ 18; Doc. No. 3-5.) By failing to include photographs of each of the fourteen pieces and more clearly explain how or why her

presentation of these pieces at the Untitled Art Fair will be negatively impacted by Defendants'
alleged infringement of the "Memphis Chainsaw" Artwork and the Photographs at issue herein,
Plaintiff has failed to carry its heavy burden of clearly showing that a TRO should issue without first
providing Defendants the opportunity to respond.

Accordingly, and for all the reasons set forth above, the Court concludes that Plaintiff has
failed to satisfy the requirements of Rule 65(b)(1)(A) and *ex parte* relief is therefore inappropriate.

## C.    Other Concerns

In light of the above, the Court denies Plaintiff's Motion for TRO without prejudice, and
without reaching its merits.  While not reaching the merits, the Court feels compelled to note the
following.  Had the Court reached the merits and considered the four TRO factors,  it would have had
serious reservations about granting the requested TRO based on what has been presented to the Court
to date.  In addition to the Court's concerns about Plaintiff's unexplained delay (discussed *supra*), the
Court has significant concerns about whether it has jurisdiction to impose the requested relief over
the five Defendants in this action that are citizens of the United Kingdom, given the lack of service
on these international defendants.[9]  Even aside from this issue, the Court has concerns regarding
whether it has personal jurisdiction over these Defendants.  While not deciding these issues, the Court

---

[9] As the Sixth Circuit has noted, the requirement of proper service of process "is not some mindless technicality."
*Friedman v. Estate of Presser*, 929 F.2d 1151, 1156 (6th Cir. 1991).  *See also Federal Trade Commission v. Repair All
PC, LLC,* 2017 WL 2362946 at * 2 (N.D. Ohio May 31, 2017).  Rather, service of a summons and complaint "must meet
constitutional due process and the requirements of the federal rules in order for jurisdiction to exist over a defendant."
*Federal Trade Commission*, 2017 WL 2362946 at * 2. Federal Rule of Civil Procedure 4(h) governs international service
of process on foreign businesses. Specifically, this Rule authorizes service of process on a foreign business in the same
"manner prescribed by Rule 4(f) for serving an individual, except personal delivery . . ." Fed. R. Civ. P. 4(h)(2).  Rule
4(f) provides, in relevant part, as follows: "Unless federal law provides otherwise, an individual . . . may be served at a
place not within any judicial district of the United States: (1) by any internationally agreed means of service that is
reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial
and Extrajudicial Documents;*** (3) by other means not prohibited by international agreement, as the court orders." Fed.
R. Civ. P. 4(f).

registers its serious doubts about the propriety of granting Plaintiff's requests for orders of impoundment, for example, on the property of international defendants who have not been served in accordance with the Hague Convention.  Notably, Plaintiff fails, entirely, to acknowledge or address these concerns at any point in its Motion.

These concerns also show why Fed. R. Civ. P. 65(c) provides for a security requirement. *See* Fed. R. Civ. P. 65(c) ("[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained"). Here, Plaintiff fails to adequately explain why it should not be required to post security, particularly given the extraordinary breadth of the requested TRO and the concerns noted above.

## V.     Conclusion

Accordingly, and for all the reasons set forth above, Plaintiff's Motion for Leave to File Memorandum of Law in Excess of Local Rule Page Limit (Doc. No. 4) is GRANTED.  Plaintiff's Motion for TRO and for Order to Show Cause (Doc. No. 3) is DENIED WITHOUT PREJUDICE. Plaintiff is hereby ORDERED to serve copies of the Complaint and the Motion for TRO (as well as all Exhibits thereto) and a copy of this Order on the Defendants, and to promptly file proof of service on these Defendants once service has been perfected.  Once Defendants have been served and appear in this action, the Court will set a status conference to discuss a briefing schedule and hearing date relating to Plaintiff's request for a preliminary injunction.

**IT IS SO ORDERED.**

*s/Pamela A. Barker*
PAMELA A. BARKER
Date:  December 3, 2024                    U. S. DISTRICT JUDGE

24