IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

Sophia Parker Studios, Inc.,

                    Plaintiff,

        -vs-

Alice Temperley, et al.,

                  Defendants.

Case No. 1:24-cv-02086-PAB

JUDGE PAMELA A. BARKER

MEMORANDUM OPINION AND ORDER

Currently pending is Plaintiff Sophia Parker Studios, Inc.'s Motion for Order for Alternative Service on Defendants' Counsel ("Motion").  (Doc. No. 12.)  For the following reasons, Plaintiff's Motion is DENIED.

## I. Background

### A. The Copyrighted Artwork and Photographs

Sophia Parker ("Ms. Parker") is the Chief Executive Officer ("CEO") of Plaintiff Sophia Parker Studios, Inc. (hereinafter "Plaintiff" or "Sophia Parker").  (Doc. No. 1 at ¶ 2.)  Ms. Parker is "a visual artist who specializes in plant-based artworks, immersive botanical sculptures, and print designs."  (*Id.* at ¶ 2.)  Ms. Parker alleges that she is "known in the art and fashion industries for [her] particular style of sculptural design, which combines geometrical botanical shapes with hand painted and vibrant geometric paint patterns."  (*Id.* at ¶ 3.)

In 2019, Plaintiff created a sculpture entitled "Memphis Chainsaw" (hereinafter "the Artwork").  (Doc. No. 1 at ¶ 36.)  Ms. Parker avers that she is the sole author of this original sculptural

work.  (*Id.* at ¶ 111.)  The Artwork is a copyright-protected sculptural work that is registered with the U.S. Copyright Office (U.S. Copyright Office Registration No. VA 2-342-734).  (*Id.* at ¶ 40.)  After creating the Artwork, Ms. Parker took photos of it in her art studio and posted four of those photos on her Instagram account, @wifenyc, between September 2019 and April 2020 (collectively, "the Photographs").[1]  (*Id.* at ¶¶ 41, 42.)  Plaintiff alleges that the Photographs are original works of authorship and that they are registered works of art with the U.S. Copyright Office (U.S. Copyright Office Registration Nos. VA 2-352-960 and VA 2-420-961.)  (*Id.* at ¶ 1.)

### B.    Allegedly Infringing Temperley London Apparel Products

Defendants Alice Temperley, TMLL, Ltd. (t/a Temperley London), and Temperley Holdings Ltd. (hereinafter referred to collectively as "the Temperley London Defendants") own a fashion brand named "Temperley London" that sells a wide range of luxury fashion items, such as embroidered dresses, kimonos, pantsuits, contemporary separates, and jackets.  (*Id.* at ¶ 5.)  Defendant Alice Temperley (the Founder and Creative Director of Temperley London) is a citizen of the United Kingdom.  (*Id.* at ¶ 28.)  Defendants TMLL, Ltd. and Temperley Holdings are private limited companies registered in England and/or Wales, with principal places of business in Ilminster, United Kingdom.  (*Id*. at ¶¶ 29, 30.)

Plaintiff alleges that in or around February or March 2022, the Temperley London Defendants began selling and distributing various fashion apparel items known as the "Farrah" and "Palmae" products.  (*Id.* at ¶¶ 8, 12.)  Plaintiff alleges that these fashion items include identical reproductions

---

[1] Ms. Parker's Instagram account has been a public account viewable to the general public since 2015, and currently has 98,800 followers.  (Doc. No. 3-6 at ¶ 12.)

and unauthorized copies of certain copyright-protected elements of Plaintiff's Artwork, yet were created without Plaintiff's knowledge, consent, or any payment to Plaintiff. (*Id.* at ¶¶ 8, 12.)

In February 2023, Ms. Parker "discovered an advertisement in a window of a store in New York City that showed a model wearing a garment created by the Temperley London Defendants [i.e., the 'Farrah Kimono'] that included a reproduction of Plaintiff's Artwork on the front and sides of it." (*Id.* at ¶ 7.) Ms. Parker "instantly recognized her Artwork on the kimono." (*Id.*) Ms. Parker's discovery that day "led to the subsequent discovery of widespread infringement of her Artwork and the Photographs by Alice Temperley MBE [and] the Temperley London Defendants." (*Id.*)

### C.    Allegedly Infringing Temperley London/Romo Defendants Interior Products

Defendants Romo Ltd., Romo (Holdings) Ltd., and Romo, Inc. (hereinafter referred to collectively as "the Romo Defendants") own an interiors furnishing brand known as "ROMO" that produces fabrics, wallcoverings, trimmings, and accessories. (Doc. No. 1 at ¶ 15.) Defendants Romo Ltd. and Romo (Holdings) Ltd. (hereinafter referred to collectively as "the U.K.-based Romo Defendants") are private limited companies registered in England with their principal places of business in the United Kingdom. (*Id.* at ¶¶ 31, 32.) Defendant Romo, Inc. is a United States corporation with its principal place of business in Chagrin Falls, Ohio. (*Id.* at ¶¶ 16, 33.) In addition, Romo, Inc. has showrooms in eight (8) U.S. cities, including New York, Boston, Atlanta, Chicago, Dallas, Washington DC, Miami, and Los Angeles. (*Id.* at ¶ 16.)

In March 2023, the Temperley London Defendants and the Romo Defendants launched a joint collaboration which "consists of fabrics, cushions, trims, and wallpaper products." (*Id.* at ¶ 17.) Plaintiff alleges that, through this collection, "Defendants again made unauthorized use of Plaintiff's Artwork and the Photographs and sold products that violated Plaintiff's copyright rights – this time

3

in the form of fabrics and cushions." (*Id*.)  That month, Plaintiff discovered that Defendants had created four (4) products as part of the collection that included almost exact replicas of the Artwork and the Photographs.  (Doc. No. 1 at ¶ 18; *see also id*. at ¶¶ 64–65.)  Plaintiff never gave permission or consent to Defendants to reproduce, display, distribute, or sell derivative works that featured the Artwork or the Photographs, and never received any payment from Defendants relating to their reproduction, display, distribution, or sale of the works.  (*Id*. at ¶ 70.)

### D.    Defendants' Allegedly Infringing Advertising Works

In addition to the sale of the aforementioned infringing apparel and interiors products set forth above, Plaintiff alleges that Defendants have and continue to reproduce, display, and distribute photographs, videos, and other advertisements that include unauthorized reproductions of the Artwork and the Photographs via their social media accounts, websites, brick-and-mortar stores, showrooms, newsletters, email blasts, and elsewhere.  (*Id*. at ¶¶ 81–82, 89–91, 101–103.)

### E.    April 2024 Cease-and-Desist Letter and Pre-Suit Negotiations[2]

On April 9, 2024, Plaintiff, through its counsel (hereinafter referred to as "Plaintiff's counsel"), sent a Cease-and-Desist Letter to the Temperley London Defendants and Romo Defendants demanding that they "immediately cease and forever desist any further reproduction, display, distribution, creation of derivative works, and sale of the infringing products listed above [i.e. Unauthorized Farrah Apparel Products, Unauthorized Palmae Apparel Products, Unauthorized Farrah Interiors Products]."  (Doc. No. 12-2 at ¶ 2; *id*. at PageID #861.)  Plaintiff further demanded

---

[2] The allegations regarding Plaintiff's counsel's communications with opposing counsel are referenced in Plaintiff's counsel's Declaration filed in support of Plaintiff's Motion.  (Doc. No. 12-2.)

that Defendants remove and/or delete "all forms of infringing advertisements, product listings, social media posts/stories, etc. displaying the above-mentioned infringing products." (*Id.*)

On April 21, 2024, Plaintiff's counsel received an email from Luca Donnini, the Chief Executive Officer ("CEO") of TMLL, Ltd., attaching an acknowledgement letter on behalf of TMLL, Ltd. and Alice Temperley confirming that they had received the Cease-and-Desist Letter sent to their U.K. registered agent address. (*Id.* at ¶ 3; *id.* at PageID #877–78.) The acknowledgement letter was cc'd to Jonathan Mould, the CEO of The Romo Group Limited, and the email enclosing the letter was cc'd to Alice Temperley MBE (AliceT@temperleylondon.com), Sarita (sarita@tsdubai.com), Neil Sexton of ROMO (neil.sexton@romo.com), and Emily Mould of ROMO (emily.mould@romo.com). (*Id.* at ¶ 4; *id.* at PageID #877–78.) On April 22, 2024, Plaintiff's counsel received an email from Neil Sexton, the Director of Romo Ltd., attaching an acknowledgement letter confirming that they had received the Cease-and-Desist Letter in their U.K. office. (*Id.* at ¶ 5; *id.* at PageID #880–81.) The email was cc'd to Luca Donnini and Emily Mould. (*Id.* at ¶ 6; *id.* at PageID #880.) On April 25, 2024, Plaintiff's counsel emailed response letters to the above-mentioned individuals agreeing to provide additional time for substantive responses, requesting revenue records, and offering to engage in settlement discussions but noting that Plaintiff did not intend to engage in a protracted negotiation period. (*Id.* at ¶ 7; *id.* at PageID #883–86.)

On May 14, 2024, Plaintiff's counsel received an email with an attached letter from a U.S.-based attorney, Attorney Alison Frey ("Attorney Frey"), who represented that she was counsel for all Defendants in the matter. (*Id.* at ¶ 8; *id.* at PageID #888–89.) Therein, Attorney Frey requested additional time to consider the claims and respond appropriately and indicated that Defendants "would like to resolve this matter outside of litigation." (*Id.* at PageID #889.) On May 16, 2024,

Plaintiff's counsel sent a response letter to Attorney Frey acknowledging receipt of her previous letter and indicating that she "look[ed] forward to receiving [Defendants'] substantive response to the April 9, 2024 demand letter by the end of next week."[3]  (*Id.* at ¶ 9; *id.* at PageID #891–92.)

On May 24, 2024, Plaintiff's counsel received an email with an attached letter from another U.S.-based attorney, Jeffer Ali, Esq. (hereinafter "Attorney Ali" or "Defendants' counsel"), stating that he had been retained to represent the Temperley London Defendants in the dispute.[4]  (*Id.* at ¶ 11; *id.* at PageID #897–99.)   In his letter, Defendants' counsel expressed willingness to "explore the possibility of resolving this matter amicably" and requested that Plaintiff's counsel send him a non-disclosure agreement to "confirm that the discussions [would] be confidential and governed by Rule 408 of the Federal Rules of Evidence."  (*Id.* at PageID #899.)  Plaintiff's counsel declares that she engaged in pre-suit negotiations with Defendants' counsel as to the Temperley London Defendants' liability, but that no deal was reached after several months.  (*Id.* at ¶ 12; *id.* at PageID #849.) Plaintiff's counsel further declares that Defendants continued to sell and display the infringing products at issue in this case during the negotiations.  (*Id.* at ¶ 12.)  Plaintiff does not indicate the date that pre-suit negotiations ended, and Plaintiff's counsel's Declaration does not attach any correspondence relating to those pre-suit negotiations, including any email sent to Defendants'

---

[3] Plaintiff's counsel declares that she did not receive any further correspondence from Attorney Frey following the May 16, 2024 letter.  (Doc. No. 12-2 at ¶ 11.) On December 5, 2024, "after several months of not receiving any correspondence from Attorney Frey," Plaintiff's counsel emailed Attorney Frey inquiring as to whether she still represented ROMO in the matter, to which Attorney Frey responded the same day that she did not.  (*Id.*; Doc. No. 12-2 at PageID #894–95.) Plaintiff's counsel provides no other correspondence sent to Attorney Frey following the letter sent on May 16, 2024 until the December 5, 2024 email—which was sent nearly seven months later and, notably, after the Complaint and Emergency Motion for Temporary Restraining Order had already been filed.  (*Id.*; Doc Nos. 1, 3.)

[4] Defendants' counsel did not mention the Romo Defendants in his letter.  (Doc. No. 12-2 at ¶ 12; *id.* at PageID #899.)

counsel in response to his request for a non-disclosure agreement in advance of settlement discussions. (Doc. No. 12.)

### F. Filing of Complaint and Motion for Temporary Restraining Order

On November 30, 2024, (over seven and a half months after sending its Cease-and-Desist Letter), Plaintiff filed a Complaint in this Court against the Defendants, asserting the following four claims: (1) direct copyright infringement under 17 U.S.C. § 501; (2) vicarious and contributory copyright infringement; (3) distribution of false copyright management information in violation of 17 U.S.C. § 1202; and (4) accounting. (Doc. No. 1.) On that same date, Plaintiff filed a Motion for Temporary Restraining Order and Order to Show Cause Regarding a Preliminary Injunction ("TRO Motion"). (Doc. No. 3.) In its TRO Motion, Plaintiff requested emergency injunctive relief in relation to an art fair that week. (*Id.* at PageID #371–72.) Specifically, Plaintiff asserted that beginning on December 4, 2024, Ms. Parker was set to display her art at an art fair in Miami Beach, and that irreparable harm would occur to Plaintiff's reputation and business unless the "artworks to be shown by Plaintiff at the Untitled Art Fair are identified by the international media, art galleries, designers, fellow artists, and potential buyers as unmistakably original to Plaintiff and no one else." (*Id.* at PageID #372.) On December 3, 2024, this Court issued a Memorandum Opinion and Order denying Plaintiff's TRO Motion. (Doc. No. 7.)

### G. Correspondence Regarding Service

On December 4, 2024, Plaintiff's counsel emailed Defendants' counsel to notify him of the filing of the lawsuit. (Doc. No. 12-2 at ¶ 15; *id.* at PageID #915–17.) In the email, Plaintiff's counsel included a copy of Plaintiff's Complaint, TRO Motion, this Court's Memorandum Opinion and Order denying the TRO Motion, and Request to Waive Service forms. (*Id.*) Plaintiff's counsel also

included a letter asking Defendants' counsel to advise if the Temperley London Defendants would be waiving service, and whether Defendants' counsel represented the Romo Defendants in the matter. (*Id.* at ¶ 16; *id.* at PageID #517.)   On December 5, 2024, Plaintiff's counsel sent a similar correspondence to the Romo Defendants and included a request that they waive service.  (*Id.* at ¶ 13–14; *id.* at PageID #901–03.)

On December 11, 2024, Defendants' counsel sent Plaintiff's counsel an email providing that the Temperley London Defendants decline to waive formal service.  (*Id.* at ¶ 17; *id.* at PageID #928.) Defendants' counsel indicated that he was surprised that Plaintiff's counsel "did not give [him] the courtesy of notice of the filing of the lawsuit, much less an ex parte motion . . . knowing that [he] represented [Defendants]."  (*Id.* at PageID #928.)  He further noted that he expected to know soon whether he would be representing the Romo Defendants in the matter.  (*Id.*)  On December 19, 2024, Defendants' counsel sent a follow-up email to confirm that he represented all the named Defendants in the case.  (*Id.* at ¶ 18; *id.* at PageID #931.)  Defendants' counsel represented that he would not be able to check with the Romo Defendants regarding any waiver of service until January 6, 2025, but provided that the other Defendants do not agree to waive formal service.  (*Id.* at ¶ 19; *id.* at PageID #931.)

On December 23, 2024, Plaintiff's counsel emailed Defendants' counsel to inquire whether he would accept formal service of process on behalf of the Defendants because he represented them all.  (*Id.* at ¶ 20; *id.* at PageID #933.)  On December 27, 2024, at Plaintiff's counsel's direction, a process server served Romo, Inc. at its registered agent address in Cleveland, Ohio.[5]  (*Id.* at ¶ 22; *id.*

_____

[5] Plaintiff further asserts that the U.K.-based Romo Defendants, Romo (Holdings) Ltd. and Romo Ltd., were also served at that address because foreign parent-companies can be served at their domestic subsidiaries.  (*Id.* at ¶ 22; Doc. No. 12-

at PageID #949.) Plaintiff's counsel declares that the Temperley London Defendants "have not been served despite Plaintiff's multiple attempts to serve them."[6] (*Id.* at ¶ 23.) On December 30, 2024, Defendants' counsel responded to Plaintiff's counsel's email that he was "not authorized to accept service on behalf of any of the [D]efendants." (*Id.* at ¶ 21; *id.* at PageID #947.)

On January 9, 2025, Plaintiff's counsel received an email containing a letter from Defendants' counsel. (*Id.* at ¶ 24; *id.* at PageID #955–56.) Plaintiff's counsel attaches a copy of Defendants' counsel's letter to her declaration that is nearly fully redacted.[7] (*Id.* at PageID #955–56.) The limited unredacted portions of Defendants' counsel's letter provide the following statements: (1) "[e]ven were Parker to effectuate service"; (2) "Parker will not timely serve the foreign defendants"; and (3) "we will await what we expect to be your futile attempts to serve the foreign defendants."[8] (*Id.*)

On January 11, 2025, Plaintiff filed the instant Motion seeking leave pursuant to Fed. R. Civ. P. 4(f)(3) to serve the Temperley London Defendants and U.K.-based Romo Defendants through alternate service upon Defendants' counsel via email or through service to his law office located in Minneapolis, Minnesota. (Doc. No. 12.) As these Defendants have not been served, no opposition has been filed.

---

1 at PageID #839.) However, as explained further below, the Court finds that Defendants Romo (Holdings) Ltd. and Romo Ltd. were not properly served at Romo, Inc.'s Cleveland location.

6 Plaintiff's counsel does not attach to her declaration proof of any service attempts upon the Temperley London Defendants. (Doc. No. 12-2.)

7 As explained later in this Opinion, the Court takes issue with Plaintiff's redactions of Defendants' counsel's letter dated January 9, 2025. (Doc. No. 12-2 at PageID #955–96.) Plaintiff's counsel does not explain the basis for these redactions, nor does the Court see any reasonable basis to redact the letter—particularly since Plaintiff's counsel has not redacted any other communication submitted to the Court. The Court therefore declines to rely on this letter as a basis to conclude that the Defendants are evading service.

8 The Court notes that each of these phrases appear separately, paragraphs apart from each other, and should thus not be read as one continuous sentence. (Doc. No. 12-2 at PageID #955–96.)

## II.     Legal Standard

As the Sixth Circuit has noted, the requirement of proper service of process "is not some mindless technicality." *Friedman v. Estate of Presser*, 929 F.2d 1151, 1156 (6th Cir. 1991).  *See also Federal Trade Commission v. Repair All PC, LLC*, 2017 WL 2362946 at *2 (N.D. Ohio May 31, 2017).  Rather, service of a summons and complaint "must meet constitutional due process and the requirements of the federal rules in order for jurisdiction to exist over a defendant." *Federal Trade Commission*, 2017 WL 2362946 at *2.

Federal Rule of Civil Procedure 4(h) governs international service of process on foreign businesses.  Specifically, this Rule authorizes service of process on a foreign business in the same "manner prescribed by Rule 4(f) for serving an individual, except personal delivery . . ." Fed. R. Civ. P. 4(h)(2).  Rule 4(f) provides, in relevant part, as follows:

> Unless federal law provides otherwise, an individual . . . may be served at a place not within any judicial district of the United States:
>
> (1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;
>
> (2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:
>
> > (A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;
> >
> > (B) as the foreign authority directs in response to a letter rogatory or letter of request; or
> >
> > (C) unless prohibited by the foreign country's law, by:
> >
> > > (i)  delivering a copy of the summons and of the complaint to the individual personally; or

10

> > (ii) using any form of mail that the clerk addresses and sends to the
> > individual and that requires a signed receipt; or

> (3) by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f).

Here, the United States and United Kingdom are both signatories to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents (hereinafter "the Hague Convention"), as referenced in Rule 4(f)(1). *See Lucas-Cooper v. Palmetto GBA*, 2005 WL 8167030 at *2 n.3 (N.D. Ohio Aug. 31, 2005).[9] The Hague Convention is a multilateral treaty that was designed to supply a simple way to serve process abroad, assure that foreign defendants receive actual and timely notice of suit, and facilitate proof of service. *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698 (1988); *Water Splash, Inc. v. Menon,* 581 U.S. 271, 273 (2017). The Hague Convention states that it "shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad." Hague Convention, Art. 1. As the Supreme Court has noted, "[t]his language is mandatory," and compliance with the Hague Convention is required "in all cases in which it applies." *Volkswagenwerk Aktiengesellschaft*, 486 U.S. at 699.

"The primary innovation of the Convention is that it requires each state to establish a central authority to receive requests for service of documents from other countries." *Id*. at 698. The central authority must attempt to serve the defendant by a method that is compatible with the receiving country's domestic laws, and then provide the applicant with a certificate either confirming that service was successful or listing the reasons that prevented service. *See* Hague Convention, Articles

---

[9] *See also* the Hague Conference website located at https://www.hcch.net.

11

2-7.  The Hague Convention also permits certain alternative methods of service (including through postal channels) unless the receiving country objects.  Although compliance with the Hague Convention is mandatory in all cases to which it applies, it does not apply "where the address of the person to be served is not known."[10]  Hague Convention, Art. 1.

The Sixth Circuit has not directly addressed whether a party must first attempt service through the Hague Convention pursuant to Rule 4(f)(1) before seeking leave to use alternative methods of service under Rule 4(f)(3).  Many district courts within this Circuit have concluded that a party need not do so, finding that there is no hierarchy or preference among the methods of service set forth in Rule 4(f).  *See, e.g., Phoenix Process Equip. Co. v. Capital Equip. & Trading Co..,* 250 F.Supp.3d 296, 306 (W.D. Ky. 2017); *Lexmark Int'l, Inc. v. Ink Techs. Printer Supplies, LLC*, 295 F.R.D. 259, 260 (S.D. Ohio 2013); *Federal Trade Commission,* 2017 WL 2362946 at *3; *Slay v. IB Travelin, Inc.,* 2019 WL 572877 at *2 (W.D. Tenn. Feb. 12, 2019); *Studio A Entertainment, Inc. v. Active Distributors, Inc.*, 2008 WL 162785 at *3 n.1 (N.D. Ohio Jan. 15, 2008).

Other district courts have expressly disagreed, finding that, if the Hague Convention is applicable, Rule 4(f) requires that parties first attempt service by the means designated in the Convention pursuant to Rule 4(f)(1).  *See, e.g., Noco Company, Inc. v. Zheijiang Quingyou Electronic Commerce Co., Ltd.*, 338 F.R.D. 100, 107 (N.D. Ohio 2021); *Liu Chang*, 2019 WL 2135665 at *4–5; *Chanel v. Zhibing*, 2010 WL 1009981 at *3 (W.D. Tenn. March 17, 2010); *Chanel v. Xu*, 2010 WL 396357 at *4 (W.D. Tenn. Jan. 27, 2010).  Still other district courts within the Sixth Circuit have

---

[10] Additionally, the Hague Convention does not apply if service can be completed without transmitting documents abroad, e.g., if substitute service on a domestic agent of the defendant is valid under local law and completed.  Further, in the case of "urgency" the Hague Convention permits courts to enter "provisional or protective measures," which has been interpreted to include "special forms of service."  *See* Hague Convention, Art. 15; Notes of Advisory Committee on 1993 Amendment to Rule 4, subdivision (f)(3).

not expressly decided the issue but have noted that the "preferred method for service of a foreign party is service pursuant to the methods authorized by" the Hague Convention.  *See, e.g., Noco Company v. Shenzhen Dika Na'er E-Commerce Co., Ltd*., 2017 WL 11540638 at * 2 (N.D. Ohio Nov. 22, 2017); *Noco Company v. Shenzhen Anband Technology,* 2018 WL 1373822 at *2 (N.D. Ohio March 19, 2018); *Midmark Corp. v. Janak Healthcare Private Limited*, 2014 WL 1764704 at *2–3 (S.D. Ohio May 1, 2014).

As regards Rule 4(f)(3), courts agree that service under that Rule must be (1) directed by the court; and (2) not prohibited by international agreement.  *See e.g., Lexmark Intern., Inc.*, 295 F.R.D. at 259; *Federal Trade Commission*, 2017 WL 2362946 at *3.  Courts have further found that, before service may be authorized under that Rule, parties may be required to show that they have "reasonably attempted to effectuate service on the defendant, and that the circumstances are such that the district court's intervention is necessary to obviate the need to undertake methods of service that are unduly burdensome or that are untried but likely futile."  *Shenzhen Anband Technology*, 2018 WL 1373822 at *2.  *See also Phoenix Process Equip. Co*., 250 F.Supp.3d at 306; *Federal Trade Commission*, 2017 WL 2362946 at *3; *Ahkeo Labs LLC v. Plurimi Investment Managers*, *LLP*, 2017 WL 2793918 at *2 (N.D. Ohio June 26, 2017).

Lastly, the Court must ensure that alternative means of service under Rule 4(f)(3) "comport with constitutional notions of due process, namely that the service of process be reasonably calculated, under all the circumstances, to apprize [sic] interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Lexmark Int'l, Inc. v. Ink Techs. Printer Supplies, LLC*, 291 F.R.D. 172, 174 (S.D. Ohio 2013).  *See also Aerodyn Engineering LLC v. Fidia*

*Co.*, 2020 WL 3000509 at *1 (E.D. Mich. June 4, 2020); *Federal Trade Comm'n*, 2017 WL 2362946 at *2.

Rulings on alternative service under Rule 4(f)(3) are discretionary. *See Shenzhen Anband Technology*, 2018 WL 1373822 at *2; *Federal Trade Commission*, 2017 WL 2362946 at *3. As one district court noted, "Rule 4(f)(3) empowers the court with flexibility and discretion to fit the manner of service utilized to the facts and circumstances of the particular case." *Federal Trade Commission*, 2017 WL 2362946 at *3.

## III.    Analysis

### A.    Service Upon U.K.-based Romo Defendants

The Court begins with Plaintiff's assertions that service has been properly effectuated on the U.K.-based Romo Defendants by serving their U.S.-based subsidiary, Romo, Inc., in Cleveland, Ohio. (*Id.* at PageID #839.) Plaintiff submits that on December 27, 2024, it successfully served Romo, Inc. at its registered agent address in Cleveland, Ohio. (Doc. No. 12-2 at ¶ 22; *id.* at PageID #949.) Plaintiff then asserts that it also successfully served the U.K.-based Romo Defendants, Romo (Holdings) Ltd. and Romo Ltd., at that same address because "service upon a domestic subsidiary of a foreign corporation constitutes proper service upon the foreign corporation as the domestic subsidiary is the foreign corporation's involuntary agent for service." (*Id.* at ¶ 22; *id.* at PageID #950–51; Doc. No. 12-1 at PageID #839 (citing *Volkswagenwerk Aktiengesellschaft*, 486 U.S. at 694)).

The Court finds that Plaintiff has failed to demonstrate that it has properly served the U.K.-based Romo Defendants. First, Plaintiff's Complaint does not even allege, specifically or upon information and belief, that Romo, Inc. is a domestic subsidiary of Romo (Holdings) Ltd. or Romo

14

Ltd., or that Romo (Holdings) Ltd. and Romo Ltd. are the parent companies of Romo, Inc.[11]  (Doc. No. 1.)  The only reference to the Romo Defendants' corporate structure appears for the first time in Plaintiff's Motion, in which Plaintiff makes the bare assertion that it served Romo, Inc.'s "U.K.-based parent companies … at that same address."  (Doc. No. 12-1 at PageID #839.)

Moreover, even if Plaintiff had alleged that Romo, Inc. was a domestic subsidiary of the U.K.-based Romo Defendants, the Court would still find that it has failed to demonstrate that service was properly effectuated.  As support for its argument, Plaintiff cites to *Volkswagenwerk Aktiengesellschaft* for the proposition that "service upon a domestic subsidiary of a foreign corporation constitutes proper service upon the foreign corporation as the domestic subsidiary is the foreign corporation's involuntary agent for service."  (*Id.*)  However, Plaintiff omits a critical detail. In *Volkswagenwerk Aktiengesellschaft*, the Supreme Court evaluated an attempt to serve a foreign corporation by "serving its domestic subsidiary *which, under state law, is the foreign corporation's involuntary agent* for service of process."  486 U.S. at 696 (emphasis added).  Specifically, in prior proceedings, the Illinois state trial court had analyzed the relationship between the parent-company

---

[11] *See, e.g.*, *Bibbs v. Allstate Ins. Co.*, 2024 WL 4124171 at *3–4 (N.D. Ohio Sept. 9, 2024).  In *Bibbs*, the court evaluated a motion to dismiss with respect to an agency theory of liability.  The court held that the complaint did not "sufficiently allege a principal-agent relationship between [parent company] AIC and [subsidiary] AFCIC."  *Id.* at *3.  The court explained that a "complaint relying on agency must plead facts which, if proved, could establish the existence of an agency relationship."  *Id.*  Upon evaluating the plaintiff's complaint, the court determined that "[n]owhere in the complaint does [plaintiff] allege that: (i) AIC is the parent company or principal for AFCIC; or (ii) AFCIC is a subsidiary or agent for AIC."  *Id.* at *4.  Accordingly, the court concluded that "the allegations in the complaint, even when taken in the light most favorable to [p]laintiff, simply do not establish a principal-agent relationship between AIC and AFCIC."  *Id.*  In this instance, Plaintiff contends that the Romo Defendants' parent-subsidiary relationship supports the assertion that the U.K.-based Romo Defendants were properly served.  (Doc. No. 12-1 at PageID #839.)  Yet Plaintiff's Complaint fails to even allege any parent-subsidiary relationship between the Romo Defendants.  (Doc. No. 1.)  Although *Bibbs* was evaluated in a slightly different context, the simple fact remains that Plaintiff cannot rely on a parent-subsidiary relationship as the basis for having properly effectuated service without even pleading that such a relationship exists.  But, as explained further below, this point is irrelevant because even if the Complaint had pled a parent-subsidiary relationship, Plaintiff's service attempt on the U.K.-based Romo Defendants would still be insufficient because such a relationship does not automatically designate the domestic subsidiary as the involuntary agent for service of the foreign parent.

15

and its wholly-owned subsidiary and determined, *under Illinois law*, that they were "so closely related" that the domestic subsidiary was the parent-company's "agent for service of process as a matter of law."  *Id.* at 697.  The Illinois trial court then certified the question to the Appellate Court of Illinois, which, after a lengthy analysis, concluded that the subsidiary was the parent-company's "agent for service of process *under Illinois law*."  *Id.* (emphasis added).

In this instance, Plaintiff's Motion is wholly distinguishable from *Volkswagenwerk Aktiengesellschaft*.  Plaintiff has not attempted to make any showing of applicable state law supporting a finding that Romo, Inc. should be deemed an involuntary agent of the U.K.-based Romo Defendants because they are "so closely related."  486 U.S. at 694, 696–97; *see also Doty v. Magnum Research, Inc.*, 994 F. Supp. 894, 895–97 (N.D. Ohio 1997) (analyzing parties' arguments as to whether a domestic entity should be considered the involuntary agent of a foreign entity and ultimately concluding that it should because the entities were "so closely related").  Instead, Plaintiff merely cites to *Volkswagenwerk Aktiengesellschaft* for a blanket-assertion that any U.S.-based domestic subsidiary of a foreign corporation must always be that foreign corporation's involuntary agent for service.  (Doc. No. 12-1 at PageID #839.)  The Court declines to adopt this broad interpretation.

Accordingly, the Court finds that Plaintiff has not demonstrated that service was properly effectuated upon the U.K.-based Romo Defendants.

**B.      Alternate Service Under Rule 4(f)(3)**

The Court next turns to Plaintiff's arguments regarding alternate service under Rule 4(f)(3). Plaintiff has not attempted to serve the Temperley London Defendants or U.K.-based Romo

16

Defendants pursuant to the Hague Convention.[12]  In its Motion, Plaintiff asserts that it should not be required to do so, and that alternative service should be permitted under Rule 4(f)(3), because Defendants refuse to waive service and Defendants' counsel "relayed via email that he was not authorized to accept service on behalf of its clients."  (Doc. No. 12-1 at PageID #834.)  Specifically, Plaintiff points to Defendants' counsel's letter dated January 9, 2025 in which Defendants' counsel wrote: "Parker will not timely serve the foreign defendants" and "we will await what we expect to be your futile attempts to serve the foreign defendants."  (*Id.*)  Plaintiff submits that it is clear from Defendants' rejection of the "multiple service attempts made by Plaintiff that they are intentionally attempting to avoid service" and "play[ing] games with the federal process rules in an attempt to delay the injunction proceedings."  (*Id.* at PageID #834–35.)  Thus, Plaintiff petitions this Court to permit it to serve Defendants through alternative means under Rule 4(f)(3) by serving Defendants' counsel via email or at his U.S.-based law office.  (*Id.* at PageID #835.)

As previously stated, while the Hague Convention is mandatory in all cases to which it applies, it does not apply "where the address of the person to be served is not known."  Hague Convention, Art. 1.  In this instance, however, the Defendants' addresses are known.  On April 9, 2024, Plaintiff's counsel *mailed* a Cease-and-Desist Letter to the Defendants' respective registered agent addresses.  (Doc. No. 12-2 at ¶ 2.)  The Cease-and-Desist Letter included the name of each Defendant and their accompanying address.  (*Id.* at PageID #854.)  The Temperley London

---

[12] Plaintiff references "Defendants' rejection of the multiple service attempts made by Plaintiff."  (Doc. No. 12-2 at PageID #834.)  However, Plaintiff does not provide any evidence of service attempts pursuant to the Hague Convention.  Rather, it appears that the "multiple service attempts" refer to Plaintiff's counsel's requests for the Defendants to waive service, and subsequently, Plaintiff's counsel's requests for Defendants' counsel to accept service on the Defendants' behalf. (Doc. No. 12-1 at PageID #845 ("Plaintiff has made multiple good faith attempts to serve the Defendants through requesting that they waive service via email and then requesting that Attorney Ali accept service on their behalves.").)

Defendants each shared the same address, while the U.K.-based Romo Defendants shared a different address. (*Id.*)  In response to the Cease-and-Desist Letter, representatives from both the Temperley London Defendants and the U.K.-based Romo Defendants sent letters to Plaintiff's counsel to "acknowledge receipt of your letter" and "confirm that we have received your above-mentioned claim." (*Id.* at PageID #878, 881.)

Accordingly, the Court finds that the Defendants' physical address is not unknown, and Plaintiff has not demonstrated that any other exception to the Hague Convention applies.  Therefore, the Court finds that the Hague Convention applies to the Defendants.  The question, then, is whether Plaintiff is required, pursuant to Rule 4(f)(1), to first attempt to serve the Defendants through the means set forth in the Hague Convention before petitioning the Court for alternative service under Rule 4(f)(3).  As discussed above, the Sixth Circuit has not decided this issue and district courts within this Circuit are divided.  *See Noco Company, Inc.*, 338 F.R.D. at 107–08 (identifying split among district courts within the Sixth Circuit regarding the hierarchy of Rule 4(f)).

For the following reasons, the Court finds that Plaintiff must attempt service on the Temperley London Defendants and U.K.-based Romo Defendants pursuant to the procedures set forth in the Hague Convention before seeking alternative service under Rule 4(f)(3).  As noted *supra,* the Hague Convention states that it "**shall** apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad."  Hague Convention, Art. 1 (emphasis added).  As the Supreme Court has noted, "[t]his language is mandatory," and compliance with the Hague Convention is required "in all cases in which it applies."  *Volkswagenwerk Aktiengesellschaft*, 486 U.S. at 699.

18

Moreover, the Advisory Committee Notes to Rule 4 explicitly recognize the mandatory nature

of using the methods of service contained in the Hague Convention when it applies:

> Paragraph (1) gives effect to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, which entered into force for the United States on February 10, 1969. See 28 U.S.C.A., Fed. R. Civ. P. 4 (Supp.1986). This Convention is an important means of dealing with problems of service in a foreign country. See generally 1 B. Ristau, International Judicial Assistance §§ 4-1-1 to 4-5-2 (1990). **Use of the Convention procedures, when available, is <u>mandatory</u> if documents must be transmitted abroad to effect service.** *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694 (1988) (noting that voluntary use of these procedures may be desirable even when service could constitutionally be effected in another manner); J. Weis, The Federal Rules and the Hague Conventions: Concerns of Conformity and Comity, 50 U.Pitt.L.Rev. 903 (1989). **Therefore, this paragraph provides that, when service is to be effected outside a judicial district of the United States, the methods of service appropriate under an applicable treaty <u>shall</u> be employed if available and if the treaty so requires.**

Fed. R. Civ. P. 4, Adv. Committee Notes (1993 Amendments) (emphasis added). In light of the

above, several district courts have determined that, where the Hague Convention is applicable, Rule

4(f) requires the parties to first attempt service by the means designated in the Convention. *See, e.g*,

*Liu Chang*, 2019 WL 2135665 at *4–5 (where physical address of defendant was known, "the Hague

Convention procedures are mandatory"); *Noco Company, Inc.*, 338 F.R.D. at 107–08 (same); *Zhibing*,

2010 WL 1009981 at *3 ("If [the Hague Convention applies], Rule 4 requires the parties first to

attempt service by the means designated in the Convention."); *Xu*, 2010 WL 396357 at *4 (same).

*See also Rice v. Electrolux Products*, 2018 WL 4964076 at *4 (M.D. Pa. Oct. 15, 2018) ("The United

States Supreme Court as well as the Advisory Committee to the Federal Rules of Civil Procedure

have explained that use of Convention procedures is 'mandatory' if documents must be transmitted

abroad to effect service.").

Although Plaintiff cites to numerous cases that have reached the opposite conclusion, many

of those cases rely on the Ninth Circuit's decision in *Rio Properties, Inc. v. Rio International*

19

*Interlink*, 284 F.3d 1007 (9th Cir. 2002).  *See, e.g.*, *Studio A. Entertainment, Inc.*, 2008 WL 162785 at *3 n.1 ("It does not appear that the Sixth Circuit has addressed the issue of whether a motion for court-authorized alternative service must be preceded by service attempts under Rule 4(f)(1) or (2). Therefore, in the absence of any controlling authority in this circuit, the Court adopts the reasoning of the Ninth Circuit in *Rio Properties* …."); *Lexmark Int'l, Inc. v. Ink Techs. Printer Supplies, LLC*, 2013 WL 12178588 at *2 (relying on *Rio*).  However, this Court has previously found *Rio* to be distinguishable because it involved service in a country that was not a member of the Hague Convention.  *See Noco Company, Inc.*, 338 F.R.D. at 108 n.4 (declining to adopt the reasoning of the Ninth Circuit in *Rio*).  Indeed, in *Rio*, the Ninth Circuit expressly acknowledged that a "federal court would be prohibited from issuing a Rule 4(f)(3) order in contravention of an international agreement, including the Hague Convention … however, the Hague Convention does not apply in this case because Costa Rica is not a signatory."  *Rio*, 284 F.3d at 1015 n.4.  Accordingly, the Court finds Plaintiff's opposing authority unpersuasive.

Plaintiff's cited authority is further distinguishable.  In *Lexmark Int'l, Inc.*, the district court noted that "[g]enerally in cases where service by email alone has been permitted [under Rule 4(f)(3)], the plaintiff has attempted service at the physical address of the defendant or by other traditional means without success, the defendant has attempted to evade service of process repeatedly despite multiple attempts to serve it by various methods, or the plaintiff was unable to obtain a physical address for the defendant."  2013 WL 12178588 at *7.  In fact, the court expressly concluded that "[a]lthough the Foreign Defendants have not waived service, *the Court is not persuaded the failure to waive service demonstrates an evasion of service*."  *Id.*  The court also highlighted that Plaintiff had not "attempted any type of physical service on the Foreign Defendants through traditional means"

20

and that a "physical address was listed on [the Foreign Defendants] website." *Id.* Accordingly, the Court denied the plaintiff's request for alternate email service.

Plaintiff's assertions fail the same. Just as in *Lexmark Int'l, Inc.*, Plaintiff has not attempted physical service upon the foreign Defendants through traditional means[13]—despite the fact that Plaintiff obtained the foreign addresses for the Temperley London Defendants and the U.K.-based Romo Defendants, and that Plaintiff's counsel has received confirmations that the Defendants have received her Cease-and-Desist Letter mailed to those respective addresses. (Doc. No. 12-2 at ¶ 2; *id.* at PageID #854, 878, 881.) Moreover, Plaintiff has failed to demonstrate that Defendants have "attempted to evade service of process repeatedly." 2013 WL 12178588 at *7. Following *Lexmark Int'l, Inc.*, the Court is "not persuaded that the failure to waive service demonstrates an evasion of service." 2013 WL 12178588 at *7.[14]

The Court is further unpersuaded by Plaintiff's contentions regarding the letter sent by Defendants' counsel on January 9, 2025. (Doc. No. 12-2 at PageID #955.) Plaintiff asserts that the following statements contained in the letter prove that the Defendants are evading service: (1) "[e]ven were Parker to effectuate service"; (2) "Parker will not timely serve the foreign defendants"; (3) and "we will await what we expect to be your futile attempts to serve the foreign defendants." (*Id.*)

---

[13] *See supra* note 12.

[14] Plaintiff relies on *Ahkeo Labs LLC* for the proposition that it "reasonably attempted to effectuate service." 2017 WL 2793917 at *2. In *Ahkeo Labs LLC*, the court determined that alternative service was appropriate because the plaintiff "reasonably attempted" to effectuate service by asking the defendants to waive service, and following their refusal, asking the defendants' counsel to accept formal service on their behalves. *Id.* The Court declines to reach the same conclusion here for two reasons. First, *Ahkeo Labs LLC* is not binding on this Court, and the Court finds the reasoning of *Lexmark Int'l, Inc.* more persuasive in concluding that "the failure to waive service [does not] demonstrate[] an evasion of service." 2013 WL 12178588 at *7. Second, as explained below, the Court declines to rely on Defendants' counsel's January 9, 2025 letter to conclude that the Defendants are actively evading service because the letter is presented to the Court without context due to Plaintiff's redactions.

21

However, Plaintiff's counsel has chosen to submit this letter to the Court entirely redacted aside from these snippets—which, notably, appear in separate non-contiguous paragraphs and should not be read as a continuous sentence. (*Id.*) Thus, Plaintiff's redactions fully prevent the Court from evaluating the context in which these statements were made.[15] In light of Plaintiff's intentional decision to redact the letter and remove any context for this Court to evaluate, and considering that the Defendants have not filed an opposition because they have not yet been served and thus have no opportunity to explain these statements, the Court declines to rely on Defendants' counsel's letter dated January 9, 2025 as a basis for permitting alternate service under Rule 4(f)(3).

Accordingly, Plaintiff's Motion is denied without prejudice. Plaintiff must instead attempt to proceed with service consistent with the requirements of Rule 4. If Plaintiff is still unable to effectuate service upon the Defendants within ninety days of this Order, Plaintiff may file a renewed motion to serve the Defendants by alternative means that sets forth Plaintiff's documented good-faith service efforts.

## IV.     Conclusion

For all the reasons set forth above, Plaintiff's Motion for Order for Alternative Service (Doc. No. 12) is DENIED. Plaintiff must attempt to proceed with service consistent with the requirements of Rule 4. If Plaintiff is still unable to serve the Defendants within ninety days of this Order, Plaintiff

---

[15] As one example, the Court observes that one month prior to the letter, Defendants' counsel raised concerns to Plaintiff's counsel regarding the lack of notice as to Plaintiff's lawsuit and ex parte motion. (Doc. No. 12-2 at PageID #928.) The Defendants refusal to waive service and accept alternate service through counsel followed shortly after. It is unclear due to Plaintiff's redactions whether those concerns were addressed in Defendants' counsel's letter in relation to the Defendants' decisions regarding service. The Court declines to accept Plaintiff's counsel's proposed meaning of the snippets of Defendants' counsel's letter without knowing the full content of the letter.

may file a renewed motion to serve the Defendants by alternative means that includes Plaintiff's documented good-faith service efforts.

**IT IS SO ORDERED.**


 *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  February 3, 2025        U. S. DISTRICT JUDGE