**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

**Sophia Parker Studios, Inc.,**              **Case No. 1:24cv2086**

      **Plaintiff,**

      **-vs-**                                   **JUDGE PAMELA A. BARKER**

**Alice Temperley, et al.,**

      **Defendants.**                           **ORDER**

The Court is in receipt of Plaintiff's Supplemental Position Paper (Doc. No. 121), Defendants' Opposition to Plaintiff's Position Paper (Doc. No. 123), Plaintiff's Second Supplemental Position Paper  (Doc. No. 124), Plaintiff's Motion for Leave to Exceed Page Limit for Supplemental Position Paper *Instanter* (Doc. No. 125), and Defendants' Motion to Strike Plaintiff's Second Supplemental Position Paper (Doc. No. 126).

As an initial matter, Plaintiff's Motion for Leave (Doc. No. 125) is denied and Defendants' Motion to Strike (Doc. No. 126) is granted.  The Court specifically ordered that no replies would be permitted, and Plaintiff's Second Supplemental Position Paper is an attempt to reply to the arguments raised in Defendants' Opposition.  The Court therefore strikes Plaintiff's Second Supplemental Position Paper.  After carefully reviewing the parties' Position Papers, the Court rules as follows:

1.    <u>Revenue</u>.  Plaintiff asserts that "Defendants have not provided any detailed total revenue numbers concerning U.S.-based sales (i.e. any products shipped to the U.S.) of the 'Palmae' apparel products."  (Doc. No. 121, PageID #9576.)  Defendants respond that "[t]hose numbers have been provided, and Defendants have also produced invoices showing U.S. sales of all the allegedly infringing products."  (Doc. No. 123, PageID #9597.)  Based upon Defendants' representations, the

Court finds that this issue has been resolved.

2.      Domestic Invoices. Plaintiff asserts that Defendants "must confirm whether the unredacted invoices provided pertain to ALL sales where any of the infringing products were shipped to the U.S." and asserts that "Defendants must also provide per showroom sales information for each Romo showroom."  (Doc. No. 121, PageID #9576.)  Defendants respond that "the unredacted invoices Defendants produced on June 8 document all sales of the allegedly infringing products into the U.S." (Doc. No. 123, PageID #9596–97.)   The Court did not order Defendants to provide "per showroom sales information for each Romo showroom," and declines to do so here.  And based on Defendants' representations, the Court finds that the issue of producing all U.S. invoices has resolved.

3.      Royalty Statements. Plaintiff asserts that "Defendants have not produced the actual written quarterly royalty statements that were provided by Romo Ltd. to Temperley Holdings Ltd. for the 'A World Less Ordinary' collection as they were ordered to produce" and that "Defendants only produced an Excel spreadsheet purporting to represent the amounts at issue with no identification of the products sold, how many were sold, when they were sold, to whom they were sold, etc." (Doc. No. 121, PageID #9576.)   Defendants respond that "the Court did not specify a format for such statements or what they should include" and that "[t]he spreadsheets that Defendants produced, TMP002432, ROMO000665, provide all relevant information regarding the calculation of royalties for the Farrah collection, and that is all the Court required."  (Doc. No. 123, PageID #9597.) Defendants' argument is frivolous.[1]  The Court specifically ordered that "by June 1, 2026, Defendants *will produce* unredacted invoices, *royalty statements*, and contracts with trade partners that relate to the sale of the allegedly infringing goods in the United States."  (May 4, 2026 Minutes.)  The Court's

---

[1] The Court expressly warns Defendants that further arguments like this could result in sanctions.

2

Order did not say "summaries of royalty statements" or "Excel spreadsheets itemizing royalty statements." The Court's Order plainly required Defendants to produce the *actual* royalty statements. The Court therefore orders Defendants to produce all royalty statements related to domestic sales of the Unauthorized Farrah Apparel Products, Unauthorized Palmae Apparel Products, Unauthorized Farrah Interiors Products, Unauthorized Aubin Interiors Products, and Unauthorized Advertising Works as these terms are used in the Second Amended Complaint (collectively, the "Allegedly Infringing Goods"). Defendants shall produce these royalty statements by July 9, 2026.

4.  Contracts. Plaintiff asserts that Defendants "have not produced the contracts they have with their boutiques/distributors/retailers/trade buyers who sold the infringing products as they were ordered to produce." (Doc. No. 121, PageID #9576.) Defendants respond that "[a]s Defendants informed Plaintiffs (see Ex. A, email chain between Defendants' counsel and Plaintiff's counsel dated June 15 and 16), Defendants do not have any contracts with any distributors, retailers, or buyers concerning the sales of their products." (Doc. No. 123, PageID #9597.) Based upon Defendants' representation, the Court finds that this issue is resolved.

5.  Line Sheets. Plaintiff asserts that "Defendants have not produced line sheets concerning the offering of the products to potential buyers and what the markup of those products are, etc." (Doc. No. 121, PageID #9576.) Defendants respond that "Plaintiff fails to identify any order requiring Defendants to produce 'line sheets concerning the offering of the products to potential buyers and what the markup of those products is, etc.,' nor does Plaintiff explain why it is entitled to such documents." (Doc. No. 123, PageID #9597.) The Court agrees with Defendants. Not only did the Court not order production of line sheets, but the Court did not suggest supplemental briefing concerning production of line sheets at the discovery conference. But more importantly, Plaintiff has

3

failed to make any showing as to why line sheets are relevant. The Court therefore declines Plaintiff's request to require Defendants to produce line sheets.

6. International Invoices. Plaintiff asserts that "[a]ll of the unredacted invoices as to the international sales of the infringing products at issue should be provided so Plaintiff can assess who purchased the products internationally and how they came to know about the products" and that "[a]ll sales information and financial information, including the total revenues Romo and Temperley made as to the international sales of the infringing products at issue should be provided at this time as sufficient predicate acts have been established." (Doc. No. 121, PageID #9577.) Defendants respond, citing to authority, that "[t]he predicate acts doctrine is not satisfied by downstream distribution or promotion of a product designed abroad, such as by display at trade shows in the U.S., because such advertising and promotion of infringing products is not itself infringing." (Doc. No. 123, PageID #9599.) Defendants may ultimately be correct at summary judgment, but the Court will not make a ruling on the predicate acts doctrine at this stage of the case. The Court, however, will not require Defendants to produce all international sales invoices at this time. Instead, the Court orders Defendants to produce all invoices related to the sale of the Allegedly Infringing Goods to any non-U.S. customers who also attended one of Defendants' trade shows in the United States.[2]

7. Underline: Marketing Information. Plaintiff asserts that "Defendants were ordered to produce all contracts they had with influencers, affiliate marketers, and any third parties who marketed the infringing products at issue as these documents will also show who these parties are and the global reach of their audiences, which speaks to the predicate act exception." (Doc. No. 121, PageID #9578.) Plaintiff also asserts that "Defendants were ordered to produce its contracts and payment records

---

[2] For the avoidance of doubt, "invoices" mean invoices. "Invoices" does not mean summaries of invoices.

concerning all of the influencers, affiliate marketers, and other third parties (based in the U.S. and abroad) that marketed the infringing products, yet they have not yet done so." (*Id.* at PageID #9579.) Defendants respond that "[t]he Court did not order Defendants to produce contracts and payment records concerning influencers, marketers, and other third parties based overseas, but only for such third parties located in the U.S." and "because Defendants have confirmed that no such contracts or payment records exist, there is nothing to produce." (Doc. No. 123, PageID #9597–98.) The Court agrees with Defendants and finds that this issue has been resolved by Defendants' representations.

8. <u>Indirect Profits</u>. Plaintiff asserts that "it is . . . entitled to the discovery of sales information, invoices, and total revenues generated by Defendants for both international and U.S.-based sales of all Romo and Temperley products that were sold during the time that the infringing products were displayed, promoted, and/or sold." (Doc. No. 121, PageID #9578.) Defendants respond that "Plaintiff already has information regarding revenue from the sales of non-infringing products that were part of the same invoices as sales of allegedly infringing products" and that "[e]ven if those invoices show a causal nexus (they do not), that does not entitle Plaintiff to information regarding all products sold by Defendants for all products during the relevant time period, over the entire world." (Doc. No. 123, PageID #9602.) The Court agrees with Defendants and finds that Defendants are not required to produce documents concerning sales of all Romo and Temperley products that were sold during the time that the infringing products were displayed, promoted, and/or sold. *See McDermott v. Advanstar Communs.*, 2006 U.S. Dist. LEXIS 109643, at *21–22 (N.D. Ohio Mar. 31, 2006) ("Plaintiffs fail to proffer sufficient evidence to support a causal relationship between the alleged infringements and the profits generated indirectly from those infringements").

9. <u>P&L Statements</u>. Plaintiff asserts that "Defendants must produce company-wide P&L

statements for the three (3) years prior to the sales of the infringing products and for the years in which the infringing products were sold as well as all other accounting and financial documents that Defendants have in their possession, custody, or control as these are relevant to Plaintiff's claim for indirect profit disgorgement." (Doc. No. 121, PageID #9579.)   Defendants respond that "Plaintiff's demand for company-wide disclosure of all revenues and profits is wildly overbroad, unsupported by any authority, and the Court should reject it."  (Doc. No. 123, PageID #9602.)    Plaintiff has not provided the Court with any authority as to why P&L statements are relevant here. *McDermott*, 2006 U.S. Dist. LEXIS 109643 at *21–22.  Therefore, Defendants are not required to produce the P&L statements as requested by Plaintiff.

10.    Payment Records.  Plaintiff asserts that "Defendants should also be ordered to produce all contracts and payment records concerning the publications it paid to promote the infringing products, both in the U.S. and abroad, so that Plaintiff can know the reach of those publications, and the identity of all infringers."  (Doc. No. 121, PageID #9579.)    Plaintiff further asserts that "Defendants have not produced contracts and payment records between them and their PR/marketing agencies as to the infringing collections, but these should be produced."  (*Id.*)  Defendants respond that "the Court did not order Defendants to produce all contracts and payment records concerning publications they paid to promote the allegedly infringing products, much less documents relating to publications outside the U.S." and that "Defendants were not ordered to produce contracts and payment records between Defendants and their PR/marketing agencies."  (Doc. No. 123, PageID #9598.)   Defendants argue that "Plaintiff was directed to address these issues in its Position Paper," but "instead of articulating a reasonable basis for requesting these materials, Plaintiff simply states in conclusory fashion that they must be produced."  (*Id.*)  Put simply, the Court agrees with Defendants

6

and the Court does not require them to produce this information.

11.     Design Documents.  Plaintiff asserts that "Defendants Must Provide Fabric Swatch Books, Brochures, Buyer/Wholesaler Lists, Line Sheets to Buyers/Wholesalers, and Other Promotional Materials Provided Regarding the Infringing Products and Related Product Lines" and that "Defendants Must Provide All Requested Documents and Digital Files, Including 'Layers' of those Files, Related to the Creation, Design, Development, and Production of the Infringing Products as well as All 'Inspiration' Photos Concerning that Process."  (Doc. No. 121, PageID #9580.) Defendants respond that "Defendants will provide two fabric books for the Aubin collection" and that "Defendants have already produced all creation, design, and/or development documents for all accused products." (Doc. No. 123, PageID #9598.)  The Court finds this issue is resolved based upon Defendants' representations.

12.     Photos/videos.  Plaintiff asserts that "Defendants Must Provide Photos and/or Videos of Production Studios, Rooms, etc. During the Time the Creative or Development Process of the Infringing Goods took Place." (Doc. No. 121, PageID #9580.)   Defendants respond that "Plaintiff's bare-bones assertion that photos and videos of Defendants' production studios during the creative/development process of the allegedly infringing products are 'relevant to Defendants' access to Plaintiff's artworks and liability'" is insufficient to justify requiring Defendants to produce such materials (if they even exist)." (Doc. No. 123, PageID #9598.)  Although this was not addressed by the Court's prior order, photographs and videos of the design process are plainly relevant.  Perhaps the photos will show that Defendants had a picture of Plaintiff's sculpture during the design process. Perhaps they will not.  By July 8, 2026, Defendants are ordered to produce all photographs and videos of productions studios/rooms where the Allegedly Infringing Goods were designed during the time

period when the Allegedly Infringing Goods were being designed.[3]

13.   <u>Communications</u>.  The Court finally turns to communications.  All parties have failed to abide by this Court's plain, and unequivocal order that "by June 1, 2026, the parties shall meet and confer and agree to search terms for relevant communications."  (May 4, 2026 Minutes.)  This clearly has not happened.   Therefore, the parties ***shall*** agree on search terms for communications no later than July 8, 2026.  Defendants shall produce all non-privileged, relevant communications that are identified pursuant to the agreed upon search terms by August 10, 2026.  To assist the parties with crafting their search terms, relevant communications shall include all communications (whether internal or external) concerning, Plaintiff, the copyrighted works at issue, this litigation, and the Allegedly Infringing Goods, including but not limited to, emails, text messages, DMs, Slack messages, and email blasts Defendants sent out to any email list subscribers concerning the Allegedly Infringing Goods.

14.   <u>International Revenue</u>.  The Court also orders Defendants to disclose to Plaintiff's counsel a summary of the total amount of non-U.S. sales of the Allegedly Infringing Goods.  This disclosure shall be made by affidavit or by a declaration made under penalties of perjury.  This disclosure will be made subject to Fed. R. Evid. 408, shall not be filed with this Court, and shall not be used in any deposition, hearing or trial.  Plaintiff is advised that it may not use this disclosure other than for purposes of settlement under Fed. R. Evid. 408.  This disclosure shall be made by July 9, 2026.

15.   Absent a good faith basis under the law (such as attorney-client privilege), Defendants shall not redact any documents required to be produced by this Order.

---

[3] Defendants appear to believe that no such media exists, which should make compliance with this Order very simple.

16.     The Court is confident that this Order resolves the parties' discovery disputes.  Failure to abide by the terms of this Order may result in sanctions or a finding of contempt.  But should the parties need additional Court intervention, the Court will set an in-person hearing on the remaining issues.  Party attendance (including representatives from the United Kingdom based entities) will be required.  The Court will also not permit remote appearances.

**IT IS SO ORDERED.**

Date:  June 25, 2026

 *s/Pamela A. Barker*
PAMELA A. BARKER
U. S. DISTRICT JUDGE

9